**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MUHAMMAD KHAN, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>LOCKHEED MARTIN CORPORATION, JAMES D. TAICLET, and JESUS MALAVE,<br><br>        Defendants. | No. 1:25-cv-06197-MMG<br><br>Judge Margaret M. Garnett<br><br><u>CLASS ACTION</u> |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATION OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 2

        A.      Company and Industry Background ................................................ 4

        B.      Defendants Misled Investors About Cost-Related Risks from Important
                Programs at Lockheed ....................................................................... 5

                1.      Defendants Hid Known Cost Risks from the Classified MFC and
                        Aeronautics Programs ............................................................ 6

                2.      Defendants Concealed Known Risks in the F-35 Program ...................... 9

        C.      The Truth is Partially Revealed on October 22, 2024 .......................... 11

        D.      Defendants Continued to Mislead Investors About the Classified MFC and
                Aeronautics Programs ....................................................................... 12

        E.      Defendants' Lack of Controls Over Runaway Costs is Further Revealed on
                January 28, 2025 .............................................................................. 14

        F.      Defendants Continued Misleading Investors ...................................... 15

        G.      The Full Truth Is Revealed on July 22, 2025 .................................... 17

II.     JURISDICTION AND VENUE ......................................................................... 19

III.    PARTIES ....................................................................................................... 19

        A.      Lead Plaintiffs ................................................................................ 19

        B.      Defendants ..................................................................................... 20

                1.      Corporate Defendant ............................................................. 20

                2.      Individual Defendants ........................................................... 21

        C.      Relevant Third Parties ..................................................................... 22

IV.     SUBSTANTIVE ALLEGATIONS ..................................................................... 23

        A.      Overview of Lockheed's Business ..................................................... 23

        B.      The Procurement Process ................................................................. 24

        C.      The Government Contracts at Issue ................................................... 25

|   |   | 1. | The Classified MFC Program | 27 |
|   |   | 2. | The Classified Aeronautics Program | 27 |
|   |   | 3. | The F-35 Program | 28 |
|   | D. | Defendants Falsely Touted Lockheed's Cost Management Controls and Downplayed the Risk of Losses | 29 |
|   | E. | Defendants Continued to Downplay the Risk of Losses from the MFC Program Despite Mounting Cost Challenges | 33 |
|   | F. | Defendants Misled Investors About the F-35 Program | 34 |
|   | G. | The Truth Was Partially Revealed on October 22, 2024 | 36 |
|   | H. | Defendants Doubled Down on Their Fraudulent Statements as Their Fraud Continued to Unravel | 37 |
|   | I. | The Truth Regarding the MFC and Aeronautics Programs Was Further Partially Revealed on January 28, 2025 | 39 |
|   | J. | Defendants Continued Misleading Investors About Losses in the Aeronautics Program | 41 |
|   | K. | In the Midst of Massive Losses and Internal Failures, Defendant Malave Abruptly Resigned | 42 |
|   | L. | The Full Truth Was Revealed on July 22, 2025 | 43 |
| V. | DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD | | 46 |
|   | A. | January 23, 2024 – Q4 2023 Earnings Call | 46 |
|   | B. | February 14, 2024 – TD Cowen Aerospace & Defense Conference | 50 |
|   | C. | July 23, 2024 – Q2 2024 Earnings Call | 51 |
|   | D. | October 22, 2024 – Q3 2024 Earnings Call | 53 |
|   | E. | December 3, 2024 – UBS Global Industrials and Transportation Conference | 54 |
|   | F. | January 28, 2025 – Q4 2024 Earnings Call | 56 |
|   | G. | February 13, 2025 – TD Cowen Aerospace & Defense Conference | 58 |
| VI. | LOSS CAUSATION/ECONOMIC LOSS | | 60 |

      A.      October 22, 2024 – First Partial Corrective Disclosure/Materialization of the Risk ........................................................................................................ 61

      B.      January 28, 2025 – Second Partial Corrective Disclosure/Materialization of the Risk .................................................................................................. 63

      C.      July 22, 2025 – Third Partial Corrective Disclosure/Materialization of the Risk ........................................................................................................ 65

VII.     ADDITIONAL INDICIA OF SCIENTER ............................................................ 68

      A.      Defendants' Admissions Support an Inference of Scienter ................................. 68

      B.      Defendant Malave's Departure Supports an Inference of Scienter ..................... 69

      C.      Defendants' Own Statements Themselves Support an Inference of Scienter....... 71

              1.      Defendants' Touted Superior Risk Assessment and Asserted Visibility into the MFC and Aeronautics Programs ................................. 71

              2.      Statements Regarding Current F-35 Program............................................ 72

              3.      Defendants Quantified Loss Exposure in the MFC Program While Claiming Visibility into Timing and Trajectory ....................................... 73

              4.      Statements that Lockheed's Financial Profile Had Been De-Risked........ 74

      D.      Lockheed's MFC, Aeronautics, and F-35 Programs Were Critical to the Company's Business ............................................................................................ 75

      E.      Corroborative FE Accounts Provide Further Inference of Scienter..................... 77

      F.      Defendants Taiclet and Malave Were Financially Motivated to Commit Securities Fraud .................................................................................................. 78

VIII.    CLASS ACTION ALLEGATIONS ...................................................................... 80

IX.      PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE............. 82

X.       INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................ 84

XI.      CONTROL PERSON ALLEGATIONS........................................................................ 85

XII.     CAUSES OF ACTION .............................................................................................. 87

COUNT I  For Violation of §10(b) of the Exchange Act and Rule 10b-5 against Defendants ........................................................................................................ 87

COUNT II  For Violation of §20(a) of the Exchange Act  against the Individual
    Defendants ................................................................................................................. 89

XIII.   PRAYER FOR RELIEF ................................................................................................ 90

XIV.   JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS......................................... 90

Lead Plaintiffs Local 705 International Brotherhood of Teamsters Pension Fund and New England Teamsters Pension Fund (collectively, "Lead Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Lockheed Martin Corporation, ("Lockheed," "LMT," or the "Company") during the period from January 23, 2024 through July 21, 2025, inclusive (the "Class Period"), subject to certain exclusions (the "Class"), against Defendants Lockheed, Lockheed Chief Executive Officer ("CEO") James D. Taiclet ("Taiclet"), and former Lockheed Chief Financial Officer ("CFO") Jesus Malave ("Malave," together with Taiclet, the "Individual Defendants," and collectively with Lockheed, "Defendants").[1]

The allegations herein are based on Lead Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: SEC filings by Lockheed; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews of former employees of Lockheed with knowledge of the matters alleged herein; and consultation with experts in the areas of accounting, loss causation, and

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who are individuals; (iii) any person who was an officer, director or control person of Lockheed during the Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Lockheed's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

damages. Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the Class they seek to represent, Lead Plaintiffs allege as follows:

## I.     INTRODUCTION

1.     This securities fraud class action arises from Defendants' decision to fraudulently conceal from investors the material risks and losses embedded in several of Lockheed's most consequential contracts, all the while publicly presenting to the market a false picture of sound risk controls and contained exposure to losses that misled investors and robbed them of the ability to make informed investment decisions.

2.     As detailed below, Defendants knew that several of Lockheed's important contracts—a classified Missiles and Fire Control program (the "MFC Program") and a classified Aeronautics program (the "Aeronautics Program")—were significantly over cost and would result in substantial losses that would materially impair the Company's profitability in 2024 and beyond. Defendants also knew, or recklessly disregarded, that Lockheed had inadequate cost analysis and risk management procedures in place to effectively manage these important programs, including glaring deficiencies in the procedures needed to accurately manage costs and losses from their contracts.

3.     Lockheed's cost analysis deficiencies were not limited to the classified MFC and Aeronautics Programs. At the same time, Defendants knew that the Company was also struggling to effectively manage costs within the critical F-35 aircraft program (the "F-35 Program"). Specifically, Defendants knew the F-35 Program's costs had far exceeded the initial cost expectations, resulting in financial losses, substantial delivery delays, and the delivery of non-

combat-ready aircraft—severely undermining the quality of the deliveries and casting doubt on Lockheed's capacity to sustain the United States' critical defense infrastructure. Worse, and unbeknownst to investors, these failures stemming from the undisclosed, massive cost overruns strained Lockheed's relationship with its primary client, the U.S. government, prompting the government to delay awarding contracts for the next generation of F-35 aircraft—known as Lot 18 and 19—and causing material financial harm to the Company.

4.      But rather than disclose the above risks to investors (as required under the federal securities laws), Defendants downplayed the known adverse information and affirmatively misled investors about their supposed control over rising costs and the risks to Lockheed's business. The truth was partially revealed when Lockheed disclosed massive losses from these programs on October 22, 2024 and January 28, 2025 (which materially reduced Lockheed's operating profitability and resulted in precipitous stock price declines). Nevertheless, Defendants' fraud continued, as they tried to reassure investors about their control over the cost risks, falsely telling investors that those prior charges "***significantly de-risked th[e] program[s] and significantly reduced the risk of future charges on this***" and stating, with respect to any remaining cost problems and future losses, that "***we've got it [] well-contained***."

5.      In reality, however, Defendants did not have the cost problems contained. Quite the opposite. Shortly thereafter, Lockheed's Chief Financial Officer, Defendant Malave, resigned. Months later, the full truth was revealed when, on July 22, 2025, Defendants disclosed losses to the Aeronautics Program that were *double* the size of the prior charges, revealing that Defendants had not "de-risked" the program and did not have the cost problems and losses "well-contained." Moreover, Defendants themselves finally admitted that, contrary to their Class Period misstatements, the Company did not have adequate cost analysis and risk management controls

with respect to these programs. Indeed, on that day, the new CFO admitted that, based on his review after taking over for Defendant Malave, the Company needed to implement "significant upgrade(s)" to its cost-estimation and cost-control processes—effectively admitting that the Company's prior cost analysis and risk management controls were inadequate.

6.    By the time the full truth was revealed, however, Defendants' fraud had caused investors to lose billions. This action seeks to recover those losses.

A.    **Company and Industry Background**

7.    Lockheed is a global aerospace and defense contractor that develops military and defense systems for the United States Department of Defense ("DoD"), U.S. intelligence agencies, and allied governments worldwide. As a defense contractor, Lockheed generates most of its revenue from long-term contracts with defense agencies and the military forces of the U.S. government.

8.    In order to win contracts from the government, defense contractors like Lockheed submit detailed proposals that include expected costs and/or pricing for the contract. The government evaluates the proposal, including the expected costs and/or pricing, conducts any negotiations, then issues (or "awards") the contract. Government contracts often follow two payment arrangements: cost-plus contracts (where the government agrees to reimburse the contractor for certain costs) or fixed-price contracts (where the government pays a fixed price and the contractor bears the risk of excess costs or overruns). Notably, fixed-price contracts shift significantly greater financial risk to the contractor, as any cost overruns, or excess costs, directly reduce the contractor's profitability.

9.    Moreover, because the government is the sole buyer, intense price competition often leads defense contractors to submit proposals where a contractor gambles with aggressively low pricing terms on a fixed-price contract simply to win the contract. Also called "low balling"

or "must win bids," this practice of aggressively submitting underpriced bids creates a heightened risk of loss from cost overruns. For these reasons, contractors must closely monitor the actual financial data, including costs incurred on the contract, to assess the risk of losses from fixed-price contracts. Similarly, investors closely watch how a government contractor manages the costs associated with its contracts.

10.      Indeed, throughout the Class Period, investors closely scrutinized and asked questions about Lockheed's contract types, payment arrangements, bidding practices, and oversight into program costs to accurately factor in cost-related risks from long-term contracts with the government. Investors did so because Lockheed's ability to effectively price, perform, and manage these contracts was by far the most important factor in determining whether a major project, and ultimately the Company as a whole, was profitable.

**B.      Defendants Misled Investors About Cost-Related Risks from Important Programs at Lockheed**

11.      The fraud alleged herein is simple and straightforward: despite knowing that there was a substantial risk of imminent losses related to certain contracts, Defendants affirmatively downplayed the extent of such risks and withheld the fact that the Company did not have adequate cost analysis and risk management procedures in place to accurately identify and mitigate such losses in the programs.

12.      Specifically, Defendants made false and misleading statements assuring investors that the risks related to cost overruns were well contained while concealing the fact that: (i) the Company did not have adequate cost analysis and risk management procedures in place; and (ii) two of Lockheed's classified programs, the MFC and Aeronautics Programs, were generating massive, billion-dollar cost overruns at the time and would force the Company to imminently realize billions of dollars in losses. Defendants made similar false statements and omissions

regarding the Company's F-35 Program, namely failing to disclose that project delays and ballooning costs related to implementing a new technology in the F-35 aircraft were causing several operational and cost problems, which slowed negotiations with the U.S. government and resulting in substantial financial harm to the Company.

13.     By making false and misleading statements to the contrary and withholding such materially adverse facts from the public, Defendants deprived investors of the mandatory transparency required of U.S. publicly traded companies and caused Lockheed shares to trade at artificially inflated prices throughout the Class Period, in violation of the Exchange Act.

### 1. Defendants Hid Known Cost Risks from the Classified MFC and Aeronautics Programs

14.     As Defendants would later admit, prior to and during the Class Period, Lockheed did not have adequate cost assessment and risk management procedures as it pertained to the classified MFC and Aeronautics Programs. As a result, Defendants failed to accurately identify and realize losses related to these crucial projects even though—as Defendants would also later admit—the actual losses associated with the two contracts were *billions* more than they had told investors.

15.     Worse, Defendants misleadingly told investors that they had strong visibility into these programs and closely monitored the risks associated with any mounting costs and losses. For example, on February 14, 2024, Defendant Malave misleadingly discussed losses to the classified Aeronautics Program in 2021 and assured investors that Defendants "***continue[d] to monitor that one pretty closely***." This was false. Instead of monitoring the Aeronautics Program "closely," Defendants admittedly did not have adequate processes in place to monitor cost overruns from the fixed-price contract that had ballooned to more than a billion dollars in losses by the end of the Class Period.

16.     Nevertheless, throughout the Class Period, Defendants repeatedly and affirmatively assured investors that they closely monitored cost-related risks and employed robust risk management controls to ensure that costs did not cut into the Company's profitability. For example, on January 23, 2024 (the first day of the Class Period), Defendant Malave touted the Company's purported pricing discipline and risk procedures. Specifically, Defendant Malave claimed that Lockheed had been **"employing a lot more pricing discipline"** and that when Lockheed **"make[s] an assessment of risk, . . . our pricing accounts for that risk as well[] [a]nd so that's the way we've been approaching things for really this year going into 2024**."

17.     At the same time, Defendants downplayed the known and present risks that the MFC and Aeronautics Programs (and their respective contracts) posed to the Company's profitability. Investors specifically and repeatedly questioned Defendants about these critical programs to assess the likelihood of losses from these programs' contracts and the potential impact they would have on Lockheed's margins, cash flow, and profitability.

18.     For instance, during the Company's earnings call on January 23, 2024, an analyst from Jefferies asked Defendants for clarity on how the classified MFC Program would affect the Company's margins to assess the likelihood of losses and potential impact these programs' contracts would have on Lockheed's profitability. In response, Defendant Malave downplayed the risks from the classified MFC Program and stated: "**we're just keeping a tight lid on overhead and indirect costs and streamlining that cost structure where the opportunities exist**."

19.     However, Defendant Malave's statements were false and misleading because Lockheed was not "keeping a tight lid on . . . costs," but rather, the Company had inadequate cost analysis and risk management procedures to manage and accurately account for cost-related risks associated with the two programs (which Defendants themselves later admitted). Defendant

Malave's statements were also false and misleading because they conveyed to investors that Defendants had visibility into and control over the cost risks from legacy contracts (including within the classified MFC and Aeronautics Programs), were actively monitoring these programs, and had largely mitigated the risk of material losses—thereby materially understating the Company's true risk exposure and misleading investors as to the actual and known risks from the classified MFC and Aeronautics Programs.

20.      The risk of additional losses on the programs was known at the time the statements were made. Indeed, Defendants were keenly aware that these projects were incurring massive cost overruns and were certain to incur losses far greater than had been disclosed to investors. According to former employees that worked on the MFC Program, it was known internally since well before the Class Period that the MFC Program's cost overruns would cause significant losses during the fixed-price portion of the contract. For example, according to FE-1, the "big" contract for the MFC program at issue was awarded in approximately 2018 and the program was expected to run for more than ten years. FE-1 recalled that at the time she joined the program in 2019, there were already discussions about implementing redesigns to lower the per unit cost to mitigate the possible costs. As discussed below, additional former employees corroborate and confirm the reality that Defendants knew about but concealed from investors.

21.      Moreover, former Lockheed employees described how Defendants tried to manipulate losses from certain contracts in order to make it appear as if the Company had the cost problems under control. For example, FE-2 recalled that if a contract was expected to be a loss, it was presented to management. They would discuss how they wanted to "manipulate or massage the numbers." In her opinion, Lockheed tried to make it look like they had everything under control and would "sweep things under the rug."

22.     On April 23, 2024, Defendants disclosed losses for the first time in the MFC Program and set investor expectations for full year 2024 losses. Although Defendants had just downplayed the risk of incurring charges on the MFC Program, on that day, Lockheed announced an "anticipated $100 million reach-forward loss associated with the classified program at MFC." Defendants further guided that the Company was expected to take "another $225 million in the back half of the year," meaning that, at that time, the MFC Program would lose no more than $325 million in 2024. Defendants further stated that additional lifetime losses for the remainder of the MFC Program could reach upwards of $1 billion in the years following 2024, bringing total lifetime losses on the MFC Program's contract to approximately $1.3 billion for the entire lifespan of the contract.

23.     Despite disclosing the $100 million in losses in MFC in April 2024, Defendants knew well before then that the MFC Program would cause significant losses. For example, FE-1 recalled that there were "certainly indications" prior to the April 2024 announcement that losses were going to occur. FE-1 noted that these indications had materialized "many months" prior to the announcement.

### 2.     Defendants Concealed Known Risks in the F-35 Program

24.     At the same time Defendants touted their supposed close monitoring of costs, sound risk controls, and contained exposures in the MFC and Aeronautics Programs, Lockheed experienced significant and persistent difficulties with delivering new F-35 aircraft to the U.S. government, due in part to increased costs and their negative impact on ongoing negotiations with the U.S. government.

25.     Up to that point in time, Lockheed's F-35 Program had been instrumental to the Company's success—as they have supplied combat ready F-35s to the U.S. military for years. In December 2022, the DoD mandated that the next phase of F-35 modernization, referred to as the

Technology Refresh 3 ("TR-3"), be installed in all future F-35 aircraft to substantially improve the F-35's defense capabilities.

26.    However, prior to and throughout the Class Period, Lockheed experienced significant problems implementing the TR-3 software upgrade to its F-35 aircraft, resulting in material cost pressures, operational disruptions, and delivery delays—all of which negatively impacted and reduced profitability for the F-35 Program.[2] Moreover, the operational failures and rising costs associated with the TR-3 upgrade deteriorated the relationship with the U.S. government, causing the government to delay awarding the contract for Lockheed's next batch of F-35 aircraft, referred to as Lot 18 and 19. This delay significantly harmed the Company's 2024 profitability, as Lockheed was unable to recognize revenue from excess costs incurred on the F-35 Program while the negotiations remained ongoing.

27.    Despite these known problems and their consequences, Defendants recklessly and falsely told investors that Lockheed would still be awarded the next iteration of the F-35 production contract—Lot 18 and 19—in 2024, thereby conveying continuity, funding stability, and sound risk management to investors when the opposite was true. For example, on July 23, 2024, Defendant Malave knowingly or recklessly told investors that Lockheed "***expect[ed] F-35 Lot 18 and 19 to be awarded this year, maintaining program funding, and continuity.***"

28.    However, this was false and misleading when made because the operational and cost issues caused by the TR-3 upgrade and Lockheed's inability to account for such cost issues had already strained Lockheed's relationship with the U.S. government and delayed negotiations

_____

[2] Indeed, Lockheed was unable to timely install TR-3 to a combat-ready state, prompting the U.S. government to suspend F-35 deliveries entirely in 2023. Although deliveries resumed in 2024, they did so only with a non-combat-ready version of TR-3, and F-35 deliveries nonetheless remained delayed by more than 200 days due to ongoing modernization and software integration failures.

for the Lot 18 and 19 contract, which would similarly delay funding and cause material financial harm to the Company's 2024 profitability.

      **C.     The Truth is Partially Revealed on October 22, 2024**

    29.    The risks associated with Lockheed's failure to implement adequate cost-analysis and risk-management procedures—including massive cost overruns and losses—began to crystallize into significant investor losses on October 22, 2024. On that day, Defendants partially revealed the truth regarding the risks and financial impacts associated with the F-35 Program and the classified Aeronautics Program.

    30.    With respect to the F-35 Program, Lockheed disclosed for the first time that negotiations for Lot 18 and 19 contract were stalled because contract costs had grown beyond the levels contemplated in the preliminary agreement with the U.S. government pending execution of the final contract. As a result, the Company was unable to recognize revenue and profit on approximately $400 million due to excess costs incurred on the program. Moreover, the F-35 Program saw a $450 million decrease in sales because the Company could not invoice and receive payment due to the frustrated negotiations with the U.S. government to finalize pricing on Lot 18 and 19—delays that were in part caused by increased costs that created price pressure on the program.

    31.    As for the classified Aeronautics Program, Defendants began to disclose—though still materially understated—the existence of significant losses in the fixed-price phase of the Aeronautics Program, contradicting their prior assurances that program risks were known, monitored, and contained. Specifically, on that day, Lockheed disclosed that it was forced to incur losses of $80 million on the Aeronautics Program due to "higher than anticipated costs to achieve program objectives."

32.     On this news, shares of Lockheed's common stock declined by more than 6% in a single day. Yet, Defendants continued to falsely downplay the rising cost issues and risk of losses from fixed-price contracts, thereby further misleading investors.

**D.    Defendants Continued to Mislead Investors About the Classified MFC and Aeronautics Programs**

33.     Following the fallout from Defendants' unexpected disclosure of losses in the Aeronautics division, Defendants continued to make false and misleading statements downplaying the extent of the cost issues the Company faced and its impact on the Company's profitability. Indeed, despite later admitting that Lockheed did not have a handle on just how bad the extent of the cost issues was at the time, Defendants confidently told investors that the losses in the MFC Program would be limited to no more than $325 million, when in truth, the amount would end up being a billion dollars more than that.

34.     Indeed, on October 22, 2024, Defendants told investors that full-year losses for the MFC Program in 2024 would be limited to approximately $325 million, thereby reinforcing prior statements and falsely signaling that no further material losses were expected that year. When pressed by an analyst from Goldman Sachs as to what they should expect for the MFC Program moving forward past 2024, Defendant Malave affirmed prior statements that any further losses would be amortized across the full fixed-price lifetime of the project, stating: "*[a]s far as 2025, a baseline assumption would be that we – you go from $325 million to anywhere between, say, $250 million to $300 million in losses in 2025, assuming a one-per-year type of framework.*"

35.     Defendants' false statements grew bolder thereafter. For instance, during an industry conference on December 3, 2024—mere days before the end of 2024—Defendants were pressed again by analysts about losses in the MFC Program and any potential favorable margin expansion within that segment. But rather than temper expectations and truthfully disclose that

Lockheed was about to record $1.41 billion in losses from the MFC Program in *2024 alone*, Defendant Malave instead affirmatively assured investors, in no uncertain terms, that the MFC segment would *benefit* from lower losses, describing the MFC Program as a "tailwind" instead of a headwind. Specifically, Defendant Malave stated, "***We[] also should get a benefit from lower losses from the MFC classified program that we're under – we're delivering out now. And so that will give us a little bit [of a] tailwind****.*"

36. This statement falsely conveyed to investors that: (i) losses in the MFC Program were behind the Company, (ii) remaining exposure was diminishing, and (iii) the program was transitioning from a drag on profitability to a source of greater profit margins—representations that were irreconcilable with Defendants' internal knowledge that substantially greater losses would soon be recognized when the Company disclosed 2024 full-year results the very next month. Indeed, unbeknownst to investors, Lockheed lacked adequate cost analysis and risk management procedures at that time, which caused the Company to disclose the $1.3 billion loss on the MFC Program in the fourth quarter of 2024—a disclosure that shocked analysts and investors who had relied on Defendants' previous false and misleading representations.

37. Indeed, Defendants' statements throughout the Class Period regarding the MFC Program shaped analyst expectations up to that point. As late as mid-January 2025, analysts were reliant on Defendants' prior misrepresentations regarding the MFC Program's limited losses. For instance, on January 15, 2025, analysts at UBS followed the market consensus by baking in an additional $225 million MFC charge into their model for Lockheed's 2024 results: "[w]e model a 7.7% MFC margin reflecting the next classified charge of $225mn."

38.    However, investors would soon learn what Defendants already knew when Defendant Malave made his misstatement on December 3, 2024: that Lockheed was forced to record a massive $1.3 billion loss on the MFC Program in fourth quarter 2024.

**E.    Defendants' Lack of Controls Over Runaway Costs is Further Revealed on January 28, 2025**

39.    Despite having reassured investors the prior month that the MFC Program losses were limited to just $325 million, on January 28, 2025, Defendants abruptly and unexpectedly disclosed that Lockheed would record losses of $1.3 billion related to the MFC Program in the fourth quarter of 2024—a 300% increase from what Defendants had previously told investors. Making matters worse, Defendants revealed for the first time that the previous $80 million loss in the Aeronautics Program (disclosed on October 22, 2024) was massively and misleadingly understated, and that the losses incurred were far worse. Specifically, Defendants disclosed additional quarterly losses in the Aeronautics Program of $410 million—a more than 400% increase from the previously recorded charge of $80 million.

40.    This partially revealed to the market that, contrary to their public statements downplaying cost-related risks and touting Lockheed's purportedly sound cost and risk assessments, the Company experienced significant cost pressures from the classified MFC and Aeronautics Programs that materially reduced the Company's profitability. Indeed, the losses in the classified programs reduced the MFC segment's operating profit by 73%, falling from $1.54 billion in 2023 to just $413 million in 2024. The Aeronautics Program charges also reduced the Aeronautics segment's operating profit from $2.83 billion in 2023 to $2.52 billion in 2024.

41.    Given Defendants' repeated false and misleading statements and omissions—including Defendant Malave's false statement from a month earlier that the MFC charges would

be limited to $325 million for full-year 2024—analysts and investors were completely blindsided and shocked by the joint $1.7 billion losses in the MFC and Aeronautics Programs.

42.    For example, analysts at Morgan Stanley flagged the disclosure as unexpected, writing that the "classified program losses at Aeronautics and [MFC] largely took investors by surprise" because the magnitude of potential losses had not been disclosed "to this extent." Analysts were similarly blindsided by the charge to the Aeronautics Program. For example, analysts at Deutsche Bank reported that "the $405m incremental Aeronautics charge" had not been "previewed."

43.    In response to this bombshell news, shares of Lockheed common stock plummeted over 9% in a single day, further injuring investors. And still, Defendants continued to conceal the fact that the losses were even worse, and that, for years, Lockheed did not have adequate cost analysis and risk management procedures in place to manage and control runaway costs, which would cause continuing and worsening losses.

**F.    Defendants Continued Misleading Investors**

44.    Despite the disclosure of the losses in the MFC and Aeronautics Programs on January 28, 2025, Defendants' fraud continued. In response to analysts' questions regarding the scope, trajectory, and implications of the charges, Defendants reassured the market that the losses reflected a one-time "resetting" of the programs, and affirmatively misrepresented that the underlying cost issues were now behind the Company because they had it under control. These statements falsely assured investors that the risk of further material losses had been eliminated, thereby hiding from investors the true extent and reality of the Company's cost and risk management failures.

45.    For example, on January 28, 2025, Defendant Taiclet stated that the January 28, 2025 charges had successfully "derisk[ed]" Lockheed's "financial profile," stating: "***Recording***

*charges in Q4 on these two programs enabled us to derisk the financial profile of both these*
*critical national security programs going forward, as we move into their next phases*." Defendant
Malave made similar statements regarding the Aeronautics Program, further stating that the risk
of future charges was low, stating: "*we have significantly de-risked this program and*
*significantly reduced the risk of future charges on this*."

46.    Although Defendants knew, or recklessly ignored, that Lockheed did not have an
adequate cost analysis and risk management process in place to actually ground those statements
in reality, Defendants continued making false claims about the runaway cost problems being
contained at that point. On February 13, 2025, less than three weeks after disclosing the massive
surprise losses, Defendant Malave falsely stated that, with respect to any remaining cost issues,
"*we've got it [] well-contained*." Defendant Malave assured investors that the Company had a
handle on costs for the Aeronautics Program for the next several years, stating: "*Again, we feel*
*that we've got a pretty good beat and handle on that cost over the next number of years for that*
*program*."

47.    By emphasizing their purported containment of the cost issues, Defendant Malave
affirmatively conveyed to investors that the risk of further material losses had been substantially
mitigated, despite knowing—or recklessly disregarding—that Lockheed did not have adequate
cost analysis and risk management procedures in place to determine the extent that the program
remained exposed to significant additional losses from cost overruns.

48.    Indeed, investors took Defendants' representations at face value, concluding that
Lockheed had successfully de-risked the business. For example, analysts at RBC stated that
"[w]hile we can appreciate that this likely caught investors by surprise, we expect the financial
profiles of these two classified programs to be largely de-risked, providing a cleaner setup going

16

forward." Analysts at Truist Securities were also comforted by the representations, stating that "LMT is now confident the programs are de-risked going forward."

49.    However, that was far from the truth, as would soon be revealed. Indeed, unbeknownst to investors at the time, Lockheed was already primed—and internally positioned—to declare nearly an additional $1 billion in losses on the Aeronautics Program in 2025 due to the Company's inadequate cost analysis and risk management processes and controls.

50.    Before the truth was revealed, and just weeks after making the foregoing false and misleading assurances, Defendant Malave, the Company's Chief Financial Officer, announced his resignation from the Company, leaving the undisclosed cost failures for the next CFO to clean up. Specifically, on April 17, 2025, Lockheed announced the resignation of Defendant Malave, and as explained below, finally admitted just a few months later that the Company needed to significantly improve Lockheed's cost analysis and risk management procedures.

**G.    The Full Truth Is Revealed on July 22, 2025**

51.    Shortly after Defendant Malave's suspiciously timed resignation, the full truth finally emerged regarding Lockheed's cascading chain of cost overruns. Whereas Defendants had previously minimized problems within the Aeronautics segment—attributing earlier charges to timing issues, conservative "de-risking," or isolated execution setbacks—on July 22, 2025, Lockheed stunned investors by disclosing an additional $950 million loss in the Aeronautics Program, revealing that prior disclosures had materially and fraudulently understated both the severity and persistence of the program's cost failures.

52.    Moreover, Defendants admitted that Lockheed did not have control over costs in the Aeronautics Program, contrary to their previous false statements. On that day, Defendants stated that the Company had "performed a comprehensive review of its program execution and management processes . . . in the second quarter" and based on that review, the Company needed

17

"significant updates to the program's schedule and cost estimates." This disclosure flew in the face of Defendants' prior statements on January 28, 2025 that they had "de-risked" the Aeronautics Program and had the cost issue "contained."

53.    Indeed, analysts were blindsided by the shocking $950 million loss from the Aeronautics Program and were furious with Defendants for their false and misleading statements on January 28, 2025 claiming that the Company had "de-risked" the Aeronautics program. For example, during the earnings call on July 22, 2025, an analyst from Wolfe Research bluntly asked Defendants, "why should investors feel at all comfortable that you've de-risked the problem programs, particularly the aero[nautics] classified one." Then, after Defendant Taiclet tiptoed around the Wolfe Research analyst's question, an analyst from Bank of America followed up and asked: "Just a quick follow-on to [Wolfe Research's] question, because I don't think you answered it. Why did it take $1 billion charges to change the way you're reviewing this thing?"

54.    Moreover, analysts issued scathing reports following this unexpected news, calling Lockheed a "show me" story moving forward and surmising that a resulting loss of confidence in Lockheed's ability to execute would act as a future overhang on the share price. For example, TD Cowen stated, "[u]nfortunately, the Q2 charges (especially on the classified Aero program), after what investors perceived to be a 'clean-up' Q4:24, moves LMT to an operational 'show me' story, in our view." Similarly, analysts at RBC lowered their confidence in Lockheed's ability to accurately forecast costs, stating "we believe the 2Q25 losses were significantly worse than expected, and we believe lower confidence in LMT's ability to execute will weigh on the stock." Analysts at JP Morgan shared similar frustrations, stating Lockheed was "obviously now a show-me for the market," and must do more to regain investors' trust.

55.    As a result of this corrective unexpected news, shares of Lockheed common stock declined by more than 10% in a single day, damaging investors even further.

56.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and Class members have suffered billions in losses and damages. This Action seeks to recover those losses caused by Defendants' fraud.

## II.    JURISDICTION AND VENUE

57.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

58.    Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1391(b), as upon information and belief, Lockheed shareholders reside in this District, the acts and transactions giving rise to the violations of law complained of occurred in part in this District, the false and misleading statements were disseminated in this District, and the manipulative conduct was carried out in part in this District.

59.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiffs

60.    Lead Plaintiff Local 705 International Brotherhood of Teamsters Pension Fund ("Teamsters Local 705") is a defined benefit plan headquartered in Chicago, Illinois, with more than $1.8 billion in assets under management for the benefit of its approximately 16,000 active

and retired members and beneficiaries. Teamsters Local 705 was established to provide retirement benefits to collectively bargained members of Teamsters Local Union 705. The Plan and its assets are managed by a joint Board of Trustees equally represented by labor and management. On October 24, 2025, the Court appointed Teamsters Local 705 as Lead Plaintiff for this litigation (*see* ECF No. 43). As set forth in its certification filed on September 26, 2025 (ECF No. 16-1), Teamsters Local 705 purchased Lockheed common stock during the Class Period and suffered damages as a result of Defendants' fraud.

61.    Lead Plaintiff New England Teamsters Pension Fund ("New England Teamsters") was established in 1958 to provide retirement income to eligible participants and their beneficiaries. New England Teamsters manages approximately $2 billion in assets for the benefit of its nearly 72,000 active and retired members and beneficiaries. The Fund is jointly administered by an eight-member Board of Trustees—four Trustees representing the Local Unions and four Trustees representing the Contributing Employers. All claims are processed at the Fund Office, which is located in Burlington, MA. The Fund is qualified under Internal Revenue Code ("IRC") Section 401(a) and acts as a multi-employer, defined benefit plan within the meaning of IRC Sections 414(f) and (j). On October 24, 2025, the Court appointed New England Teamsters as Lead Plaintiff for this litigation (*see* ECF No. 43). As set forth in its certification filed on September 26, 2025 (ECF No. 16-1), New England Teamsters purchased Lockheed common stock during the Class Period and suffered damages as a result of Defendants' fraud.

**B.    Defendants**

**1.    Corporate Defendant**

62.    Defendant Lockheed is incorporated under the laws of Maryland, with its headquarters and principal executive offices located in Bethesda, Maryland. The Company's common stock is traded on the New York Stock Exchange (the "NYSE") under the ticker symbol

"LMT." Lockheed is an aerospace and defense company principally engaged in the research, design, development, manufacture, integration and sustainment of advanced technology systems, products and services. A majority of Lockheed's business is conducted with the U.S. Department of Defense and U.S. federal government agencies.

### 2.    Individual Defendants

63.    Defendant Taiclet is the current Chairman, President and CEO of Lockheed. Defendant Taiclet joined Lockheed as President and CEO in June 2020 and later became Chairman in March 2021. He has also been a director on the Company's board of directors (the "Board") since January 2018. In his role as CEO of the Company, Taiclet participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact.

64.    Defendant Malave served as CFO of Lockheed from January 2022 until his departure on April 17, 2025. In his role as CFO of the Company, Malave participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact.

65.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of, *inter alia*, Lockheed's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive

representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

66.    The Company and the Individual Defendants are collectively referred to herein as "Defendants."

67.    Lockheed is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

68.    The scienter of each of the Individual Defendants and each of the other employees and agents of the Company is similarly imputed to Lockheed under *respondeat superior* and agency principles.

C.    **Relevant Third Parties**[3]

69.    FE-1 was employed by Lockheed Martin in a variety of roles from 2004 until March 2025. FE-1 became a Senior Project Manager serving a number of different areas in 2019, including MFC and joined the team responsible for executing the MFC program that the Company initially announced losses for beginning in April 2024. FE-1 explained that she departed this role in 2021. According to FE-1, following her role change in 2021, she still maintained various levels of exposure to the MFC program that reported losses.

70.    FE-2 was employed by Lockheed Martin from prior to the start of the Class Period through Spring 2025 as Senior Financial Management. FE-2 worked exclusively in MFC. FE-2 explained that she was responsible for overseeing cost analysis from when the contract was awarded through contract closeout.

---

[3] FEs are identified herein by number (FE-1, FE-2, etc.). All FEs are described in the feminine to protect their identities.

71.    FE-3 was employed by Lockheed Martin as an Engineer Manager working in the MFC group who oversaw tasks across the entire Systems Engineering V and had visibility across functional and program lines for over a decade until her retirement in 2021.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Overview of Lockheed's Business

72.    Lockheed is a global aerospace and defense corporation—one of the top five largest defense contractors in the world. The Company develops, manufactures, integrates, and sustains advanced technology systems, products, and services for defense, space, intelligence, homeland security, and related markets. Its principal customer is the U.S. government (focusing on military and defense agencies), with additional sales to international governments (via both Foreign Military Sales and direct commercial sales) and a small portion to U.S. commercial customers.

73.    The Company reports its operations through four principal business segments: (i) Aeronautics, which is engaged in the research, design, development, manufacture, integration, sustainment, support, and upgrade of advanced military aircraft; (ii) Missiles and Fire Control, or MFC, which develops and produces air and missile defense systems, tactical and strike missiles, fire control systems, mission and combat systems; (iii) Rotary and Mission Systems ("RMS"), which designs, manufactures, services, and supports military and commercial helicopters, surface ships, sea and land-based missile defense systems, radar, and other related systems; and (iv) Space, which is engaged in research, design, development, engineering, and production of satellites, space transportation systems, and strategic, advanced strike, and defensive systems.

74.    Lockheed derives most of its revenues from long-term contracts with agencies of the U.S. government. Like other defense contractors, most of Lockheed's major contracts are

awarded by the U.S. Department of Defense ("DoD")[4] through a formal procurement process involving bids and proposals.

## B.    The Procurement Process

75.    Government contracts begin with a solicitation to defense contractors, commonly through requests for proposals ("RFP"). Defense contractors like Lockheed typically provide proposals that detail price (or cost), technical approach to performance, past performance, and other government-defined evaluation factors. Price (or cost) is one of the most common evaluation factors.

76.    Two distinct payment arrangements in the contracting industry produce markedly different profitability risk profiles: (i) "cost-plus" contracts, where the government reimburses the contractor for certain allowable, allocable, and reasonable costs versus (ii) "fixed-price" contracts, where the contractor agrees to a set price, regardless of the actual costs incurred to perform the work. Thus, fixed-price contracts shift much of the risk to the contractor—for example, if labor, materials, supply-chain inputs, engineering complexity, or other requirements exceed the original assumptions made at the time of the contract, the contractor generally must absorb those additional costs, which eat into the contractor's profitability.[5]

77.    Given that the government has a "monopsony" power in defense contracting—i.e., the U.S. military is the only buyer for much of what Lockheed sells—the procurement process is highly competitive. Price is often a decisive factor in the evaluation process, especially for fixed-

---

[4] On September 5, 2025, President Trump signed an executive order changing the DoD's name to the Department of War as a secondary title. Because the Class Period ends on July 22, 2025 (i.e., before this change), Lead Plaintiffs use DoD throughout this complaint.

[5] Some contracts include a government option to modify the contract from cost-plus to fixed-price payment arrangement at certain benchmarks or levels of development, like when the contractor recorded enough expenditures to accurately assess future costs. If that assessment of future costs is understated, the fixed-price contract risks actual losses from cost overruns.

price contracts. Underpricing, or submitting aggressively low cost/price proposals, is a risky maneuver to win the contract for pennies, or even at an expected loss. These gambits are inherently risky, especially under fixed-price contracts, where the contractor bears risk of loss. When actual costs exceed the fixed contract price, the contractor absorbs the loss, eating into the company's profitability and margins. Under generally accepted accounting principles (GAAP), such losses must be recognized either when they occur or when they become probable and estimable.

78.    As a result, investors closely monitor contract type, payment arrangement, and the contract negotiation process to factor in the risks of future losses when making their investment decisions.[6] Although investors cannot directly examine these government contracts and proposals, they can—and often do—ask direct questions about the government contracting process and the financial health of specific government contracts to determine profitability and risk associated with their investment.

### C.    The Government Contracts at Issue

79.    Lockheed's government contracts are predominantly long-term contracts that are a mix of fixed-price and cost-reimbursable payment arrangements and hybrids thereof.

80.    The divergent financial dynamics associated with fixed-price versus cost-plus contracts was an issue that Lockheed dealt with regularly. For example, FE-2 recalled that cost-plus contracts had more flexibility, meaning they could go back to the client to alter if needed, while fixed-price contracts were not flexible and if they began to run over cost, they would need to reduce their profit.

---

[6] Moreover, a portion of Lockheed's business and associated contracts are deemed classified by the U.S. government. Therefore, these contracts cannot be specifically described. However, the operating results of classified contracts are included in the Company's consolidated financial statements, and the internal controls addressing financial reporting of classified contracts do not differ from non-classified contracts.

81.     Former Lockheed employees described the Company's handling of the bidding, negotiation, and execution of government contracts as inaccurate and intended to make reported figures look better as opposed to being realistically profitable. For example, in FE-2's opinion, contract proposals were never accurate, and certain contracts were negotiated improperly. She suggested that they were thrown together quickly to "help the financial numbers" and that there was no due diligence done to ensure that the Company could successfully complete the contract. FE-2 went on to suggest that contracts were taken in order to inflate numbers and to boost bonuses. FE-2 explained that many of the contracts ended up being over cost and behind schedule.

82.     Moreover, former Lockheed employees described how Defendants manipulated losses from those contracts in order to make it appear as if they had the cost problems under control. For example, FE-2 recalled that if a contract was expected to be a loss, it was presented to management. They would discuss how they wanted to "manipulate or massage the numbers." In her opinion, Lockheed tried to make it look like they had everything under control and would "sweep things under the rug."

83.     Because Lockheed's contract types are predominantly long-term government contracts, investors understood the following factors as having a significant impact on the Company's financial performance: (i) the contract revenues and Lockheed's expected and actual financial performance thereof; (ii) the different contract payment arrangements, considering the riskier fixed-price arrangement (versus cost-reimbursable); (iii) Lockheed's ability to keep programs within budget and schedule expectations based on the Company's review of program costs and expenditures; and (iv) the timing and execution of awards, options, and modifications.

84.     Throughout the Class Period, investors closely monitored three contracts: (1) the MFC Program; (2) the Aeronautics Program; and (3) the F-35 Program.

### 1.    The Classified MFC Program

85.    The MFC Program is a classified contract with the U.S. government within the Company's MFC division. Given its classified nature, Lockheed has not publicly stated exactly what they are making for the government. However, Lockheed defined the terms of the contract as follows: a "cost-reimbursable base contract for the initial phase of the program and multiple fixed-price options for additional phases."

86.    Based on FE accounts and Defendants' own statements, the MFC Program was awarded in or around 2018 and expected to last for at least 10 years, converting to fixed-price in or about 2024. According to FE-1, the "big" contract for the MFC program at issue was awarded in approximately 2018 and the program was expected to run for more than ten years.

87.    For the first few years of the contract, Lockheed's costs were reimbursable under the cost-reimbursement stage of the contract (i.e., the base contract). Then, in or around 2024, the contract converted to a fixed-price contract, which meant Lockheed immediately absorbed significant financial losses from cost overruns.

### 2.    The Classified Aeronautics Program

88.    The Aeronautics Program is a classified program within the Company's Aeronautics segment. The Company describes the contract as a "fixed-price incentive fee contract," structured as a base contract for the initial phase of the program and multiple options for additional phases. Under these additional phases, Lockheed can earn incentive fees for cost savings or exceptional performance but bears the financial risk for cost overruns when actual costs exceed target cost ceilings. Accordingly, under the contract, once Lockheed's costs exceed specified thresholds, the Company's profit decreases and financial liability for cost growth and therefore losses increase.

### 3.    The F-35 Program

89.    The F-35 is an aircraft developed by Lockheed for the U.S. and allied militaries. It is a multirole combat aircraft designed for not just flying, but also intelligence, surveillance, and reconnaissance. Lockheed is the prime contractor for the F-35 aircraft under a multi-decade contract with the DoD through the F-35 Joint Program Office ("JPO"). The F-35 Program has been critically important to Lockheed's financial success for over a decade, with the program accounting for approximately a quarter of Lockheed's revenues since 2017. Indeed, in 2023 (the full year before the start of the Class Period), sales of the F-35 represented 26% of Lockheed's total revenues.

90.    Contracts in the F-35 Program are negotiated and awarded based on successive production blocks, referred to as a "Lot," under which Lockheed must deliver aircraft that conform to specified hardware and software configuration baselines as a condition of acceptance and final payment.

91.    Beginning in or around 2022, the DoD approved the next phase of F-35 modernization, referred to as TR-3, which introduces a new integrated core processor, expanded memory, and improved cockpit displays designed to support advanced capabilities. TR-3 is a prerequisite for the next major capability upgrade of the F-35 aircraft, known as Block 4, which adds new weapons, enhanced sensors, and improved electronic warfare functionality. The DoD required that all F-35 aircraft incorporate TR-3 beginning in 2023.

92.    On December 22, 2022, the DoD announced that they awarded Lockheed an "advance acquisition authorization" agreement to work on the next generation, Lot 18 and 19. Advance acquisition authorization permits a contractor to begin work and incur costs before a full production contract is formally awarded by the government. The advance acquisition contract under Lot 18 and 19 was limited to the procurement of long lead time materials, parts, components,

and efforts necessary to maintain production and delivery of F-35 aircraft. The contract was fixed-price insofar that it would only fund approximately $1 billion in costs related to the advanced procurement. Therefore, although the advance acquisition contract allowed Lockheed to begin work in anticipation of the future contract, it shifted substantial financial risk to Lockheed for any cost overruns. Because pricing and terms are not finalized, the contractor may be required to absorb cost overruns if negotiations are prolonged and conclude at prices below incurred costs, particularly under fixed-price or fixed-price incentive structures.

93.    Investors understood that the Company was performing work on Lot 18 and 19 under an advance acquisition contract (i.e., the formal production contract was still under negotiation). However, as explained below, Defendants did not tell investors that rising costs from the TR-3 upgrade caused turmoil with the U.S. government and led to significant delays in contract negotiations over the formal award for the Lot 18 and 19 contract. Indeed, Defendants affirmatively assured investors that the formal production contract for Lot 18 and 19 would be awarded in 2024 (which would allow the Company to maintain program funding and continuity). As a result, investors did not understand the risk that Lockheed would be unable to recognize hundreds of millions of dollars' worth of revenue on the program while Lockheed attempted to salvage its relationship with the government and finalize the Lot 18 and 19 contract.

### D.    Defendants Falsely Touted Lockheed's Cost Management Controls and Downplayed the Risk of Losses

94.    Throughout the Class Period, Lockheed was facing a multi-vector cost crisis. Specifically, the MFC, Aeronautics, and F-35 Programs—some of the Company's most important programs—were imminently set to incur billions in losses and financial impacts, which facts were known to, or recklessly disregarded by Defendants. Critically, such issues were driven by

Lockheed's materially deficient internal processes for identifying, assessing, and mitigating cost and execution risks.

95.     Indeed, unbeknownst to investors, during the Class Period, Lockheed lacked adequate oversight mechanisms to monitor cost risks across its most complex and technically demanding programs, including the MFC, Aeronautics, and F-35 Programs. Despite these oversight failures, Defendants publicly lauded Lockheed's internal cost-management, risk-assessment, and oversight practices, portraying the Company as exercising heightened discipline in managing program costs and risks.

96.     For example, on January 23, 2024 (the start of the Class Period), Defendants held an earnings call with analysts and investors to discuss the Company's fourth quarter 2023 results. During the call, analysts queried Defendants regarding how Lockheed was managing risks from its contracts. For example, an analyst from Citi Research asked Defendants for an update on the risks from Lockheed's current contracts (including its fixed-price contracts) and whether the Company is "toggling back more towards less risky programs." In response, Defendant Malave downplayed any risks from ongoing contracts and falsely assured investors that the Company was adequately assessing risks. Specifically, Defendant Malave stated:

> The other thing that we're – just to talk about what we're thinking about contractually, and Jim has really led the way here, is that **we just are employing a lot more pricing discipline than we have more recently. And we're looking at things and ensuring that it's just a more analytical support for the way we approach pricing, that we capture any types of technological advantages that we may have. Also, as we make an assessment of risk, the contracting vehicles appropriate to that risk, but that our pricing accounts for that risk as well**. And so that's the way we've been approaching things for really this year going into 2024, and I'll hand it over to Jim.

97.     Analysts then followed up to determine how Lockheed's purportedly "analytical" approach to pricing and assessing risk would relate to risks from the Company's classified MFC

and Aeronautics Programs. For example, during the Company's earnings call on January 23, 2024, an analyst from Jefferies asked about how the MFC Program would impact the Company's margins. In response, Defendant Malave stated that that the Company was "***keeping a tight lid on overhead and indirect costs***."

98.     Similarly, on February 14, 2024, during the TD Cowen Aerospace & Defense Conference, Defendant Malave further misled investors about the Company's control over cost-related risks. During the conference, the moderator asked about "any [] programs that . . . are sort of in the watch category, that you're nervous about, that could come?" In response, Defendant Malave stated that "the classified program at Aeronautics, which has fixed-price development to it, that's always a watch item for us." However, Defendant Malave then claimed that "***we continue to monitor that one pretty closely***" and downplayed any future risks of losses from the Aeronautics Program, merely stating there was a "***possibility that a risk can surface there because it is fixed-priced development***." Defendant Malave echoed this sentiment for the MFC Program and plainly stated the Company was "***not aware of any other contracts that are below the surface [] that would cause any material issues***."

99.     Taken together, Defendant Malave's statements on January 23, 2024 and February 14, 2024 were materially false and misleading because they led investors to believe that Defendants were closely monitoring cost risks, especially within riskier fixed-price contracts, and that Lockheed's internal monitoring of those risks were adequate, when in reality, Defendant Malave knew—or was reckless in not knowing—that Lockheed had inadequate cost analysis and risk management procedures to manage costs and accurately identify and realize cost-related risks associated with the programs.

100.    As Defendants later admitted at the end of the Class Period, the Company's risk-identification processes during that time failed to address escalating cost overruns and loss exposure. Indeed, it was only after disclosing billions in cost overruns that Defendants announced they were finally implementing a "comprehensive risk identification and corrective action plan" in order to "improve the performance and oversight of th[e] program." This admission demonstrates that, contrary to Defendant Malave's statement, Lockheed did not have adequate oversight processes in place at the time for these programs and did not have "a tight lid on . . . costs" from these programs.

101.    FE accounts corroborate that Lockheed lacked sufficient procedures to assess, manage, and mitigate cost issues from the classified programs prior to and throughout the Class Period. For example, according to FE-1, the "big" contract for the MFC program at issue was awarded in approximately 2018 and the program was expected to run for more than ten years. FE-1 recalled that at the time she joined the program in 2019, there were already discussions about implementing redesigns to lower the per unit cost to mitigate the possible costs. FE-1 noted that losses on the program were becoming "increasingly likely" in early 2024. According to FE-1, the Company had "run out of time" to implement design changes and the process of changing qualifications on a contract takes time and is "extremely expensive."

102.    In FE-2's opinion, contract proposals were never accurate, and certain contracts were negotiated improperly. She suggested that they were thrown together quickly to "help the financial numbers" and that there was no due diligence done to ensure that the Company could successfully complete the contract. FE-2 went on to suggest that contracts were taken in order to inflate numbers and to boost bonuses. FE-2 explained that many of the contracts ended up being over cost and behind schedule.

103.    FE-2 recalled that if a contract was expected to be a loss, it was presented to management. They would discuss how they wanted to "manipulate or massage the numbers." In her opinion, Lockheed tried to make it look like they had everything under control and would "sweep things under the rug."

### E.    Defendants Continued to Downplay the Risk of Losses from the MFC Program Despite Mounting Cost Challenges

104.    By the start of the Class Period, the MFC and Aeronautics Programs had been pending for years. Therefore, had Defendants implemented adequate monitoring and controls, they would have possessed detailed program-level cost data, clear visibility into execution challenges, and a reliable basis for assessing whether costs could be recovered under the applicable fixed-price contracts. Nevertheless, despite their lack of oversight into these contracts, Defendants recklessly downplayed the risk of losses from both programs throughout the Class Period and told investors that the MFC Program would lose at most $325 million in 2024.

105.    For example, on April 23, 2024, in connection with the Company's first quarter 2024 results, Lockheed disclosed a $100 million reach-forward loss associated with the MFC Program. At that time, Defendant Malave stated that the Company expected to incur an additional $225 million in losses in the second half of 2024, indicating that total losses attributable to the MFC Program in 2024 would be approximately $325 million. Defendants further explained that additional *lifetime* losses for the remainder of the MFC Program (over the next several years) could reach upwards of $1 billion in years following 2024, bringing total lifetime losses on the MFC Program's contract to approximately $1.3 billion over the next several years of contract—thereby describing the expected financial impact as occurring primarily in future years after 2024.

106.    However, the likelihood of significant losses in the MFC Program was known internally well before the April 23, 2024 announcement of a $100 million loss recorded in the first

quarter 2024. For example, FE-1 recalled that it was a "known likelihood" losses would occur "many months" prior to the April 2024 announcement.

107.    Indeed, the MFC Program was plagued by cost challenges from the outset that called into question the program's financial viability. For example, FE-1 recalled that at the time she joined the program in 2019, there were already discussions about implementing redesigns to lower the per unit cost to mitigate the possible costs. FE-1 further recalled a "poor business decision" that was made in 2021 by the VP responsible for the program at that time. FE-1 explained that he had made the decision to not pursue design changes when they would have been "most helpful." FE-1 recalled bringing design changes to this VP and being told to "put them on the shelf." FE-1 further recalled that these design changes were later "picked up" but at that point it was too late to fully implement them.

108.    Similarly, according to FE-3, the schedules for the classified MFC program were "challenging from the get-go" and management was "making moves" to bring the Company's "best and brightest" onto the program in approximately 2020. FE-3 recalled that she was "confident" there were concerns around the uncertainty of the program and its financial viability at this time. FE-3 added that senior management was aware of these issues around the program at least as early as 2020.

### F.    Defendants Misled Investors About the F-35 Program

109.    Lockheed's oversight failures were not limited to the classified MFC and Aeronautics Programs during the Class Period. At the same time, the F-35 Program was beset by execution and cost failures stemming from Lockheed's inability to timely and effectively implement the mandatory TR-3 upgrade.

110.    Prior to the start of the Class Period, Lockheed failed to achieve TR-3 software maturity and certification, resulting in nearly year-long delivery delays for Lots 15-17 and costs

exceeding contract pricing assumptions. These rising costs were caused by Defendants' failure to manage and implement the TR-3 upgrade. Indeed, total F-35 Program costs increased from approximately $442 billion in December 2022 to $485 billion in December 2023—an increase of nearly $43 billion, or about 10% in a single year—which was mostly attributable to rising TR-3 software development costs.

111.    Moreover, these escalating program-level cost pressures further heightened the potential financial impacts posed by Defendants' inability to implement the TR-3 upgrade. Most notably, Defendants' failure to implement the TR-3 in Lots 15-17 caused the JPO to refuse to accept new aircraft deliveries for over a year (until July 2024), which complicated and delayed contract negotiations with the government over Lot 18 and 19 because the two sides could not agree on the relevant costs for the new project. Moreover, the JPO even withheld payments while delivery certification issues persisted, making negotiations on future contract terms and pricing more intricate. These problems caused significant delay over the Lot 18 and 19 contract and meant that Lockheed would be unable to recognize certain revenue until the Lot 18 and 19 contract was finalized, a known and material risk to Lockheed's ability to recognize a critical revenue stream in 2024.

112.    Nevertheless, Defendants touted the F-35 Program and blindly told investors that the Lot 18 and 19 contract would still be awarded in 2024. For example, on July 23, 2024, Defendant Malave knowingly or recklessly told investors that Lockheed still "***expect[ed] F-35 Lot 18 and 19 to be awarded this year, maintaining program funding, and continuity.***"

113.    However, this was false and misleading when made because it concealed material adverse facts regarding the F-35 Program that posed a significant risk that the program's funding and continuity would be disrupted. Specifically, Defendants failed to disclose that the operational

and cost issues caused by the TR-3 upgrade and Lockheed's inability to address such cost issues had already strained Lockheed's relationship with the U.S. government and delayed negotiations for the Lot 18 and 19 contract, which would delay funding and cause material financial harm to the Company's 2024 profitability. Indeed, at this time, Lockheed still had not delivered any combat-ready F-35 aircraft with the TR-3 upgrade, which complicated pricing discussions around the Lot 18 and 19 contract and significantly delayed the award. Accordingly, by highlighting continued program funding and continuity, Defendant Malave presented a misleadingly positive picture of the F-35 Program.

### G. The Truth Was Partially Revealed on October 22, 2024

114.    Before the market opened on October 22, 2024, Lockheed announced that the Company was forced to incur higher than expected costs within its Aeronautics segment, specifically related to the classified Aeronautics Program and F-35 Program.

115.    First, with respect to the F-35 Program, despite previously touting the resumed delivery of F-35 aircraft and assurances that the Lot 18 and 19 contract would be awarded that year, Lockheed disclosed that contract negotiations for Lot 18 and 19 had stalled, and the DoD would not award the final contract in 2024. Specifically, due to rising costs, Lockheed announced that negotiations with the DoD regarding the finalization of Lots 18-19 were materially delayed, and as a result, Defendants would not be able to recognize revenue until the contracts were finalized.

116.    Given the delay in receiving the finalized contract, the Company was unable to recognize revenue and profit on approximately $400 million in costs incurred on the program, with at least an additional $300 million worth of impact across the supply chain. Moreover, the F-35 Program saw $450 million less in sales because the Company was unable to invoice and receive cash from the U.S. government due to the ongoing negotiations.

117.    Defendants' disclosure of the cost overrun-driven contract delays and ongoing TR-3 issues with the F-35 Program sparked substantial concern among investors and market participants. For example, an analyst from Bernstein Research also wrote that the "most negative result" announced in the disclosure "was a miss in Aeronautics due to F-35, driven by delays in authorization on Lot 18/19 contracts and ongoing TR3 issues."

118.    Second, Lockheed disclosed that the Company was forced to incur losses of $80 million on the Aeronautics Program due to "higher than anticipated costs to achieve program objectives." Analysts were surprised—and concerned—by the $80 million charge to the Aeronautics Program. Deutsche Bank Research wrote that the $80 million loss due to the classified Aeronautics Program was inconsistent with their expectations and will drive "some incremental concern on our part going forward."

119.    On this news, shares of Lockheed's common stock declined $37.63 per share, or more than 6%, from a closing price of $614.61 on October 21, 2024, to a closing price of $576.98 on October 22, 2024.

**H.    Defendants Doubled Down on Their Fraudulent Statements as Their Fraud Continued to Unravel**

120.    Defendants sought to quell investor concern stemming from the shocking announcement of cost overruns causing significant losses. Specifically, on October 22, 2024, despite knowing that cost overruns were going to be significantly higher in the MFC Program, Defendant Malave reaffirmed previous statements regarding losses in the MFC Program, stating that Lockheed still expected additional 2024 losses on the MFC Program of "***about $225 million***," with total 2024 losses of $325 million.

121.    When pressed by analysts as to what they should expect for 2025 regarding the MFC Program, Defendant Malave affirmed prior statements that any further losses would be

spread across the next several years of the project, stating: "*[a]s far as 2025, a baseline assumption would be that we – you go from $325 million to anywhere between, say, $250 million to $300 million in losses in 2025, assuming a one-per-year type of framework.*"

122.    Defendants' false statements grew bolder thereafter. For instance, during an industry conference on December 3, 2024—less than a month out from the end of 2024—Defendants were pressed by analysts regarding potential favorable margin expansion in the MFC segment. Defendant Malave in no uncertain terms responded that the MFC segment would actually *benefit* from lower losses from the MFC Program, describing it as a "tailwind": "*We'll also should get a benefit from lower losses from the MFC classified program that we're under – we're delivering out now. And so that will give us a little bit [of a] tailwind.*"

123.    In other words, throughout 2024—and as late as December 2024—Defendants told investors that losses on the MFC Program would not exceed $325 million for the full year, and that future losses would be spread over future years. Indeed, Defendants plainly stated that future losses in the MFC Program would be *less* than those incurred in 2024 (i.e., less than $325 million), leading investors to believe that the $325 million loss in 2024 would be the worst of the charges. Further, Defendants fraudulently stated that the MFC Program would increase margins within the MFC segment because of these purportedly lower losses, referring to the current situation as a "tailwind," *i.e.*, something that would benefit the Company.

124.    Such statements were materially false and misleading when made because they assured investors that losses on the MFC Program were limited, predictable, and declining, when in reality, Defendants either knew or were severely reckless in not knowing that Lockheed lacked adequate cost-assessment and monitoring processes to reliably quantify or contain mounting cost overruns. By presenting the program as a source of improving margins and a "tailwind,"

Defendants concealed that the magnitude and timing of losses were materially uncertain and uncontained due to unresolved execution challenges and deficient cost controls and oversight, rendering their assurances misleading.

125.    Defendants' statements regarding the MFC Program shaped analyst and investor expectations throughout the Class Period. With no intervening disclosures to suggest otherwise, analysts continued to rely on Defendants' representations that the MFC Program would lose $325 million in 2024.[7] That reliance persisted into mid-January 2025 (shortly before the truth regarding the MFC Program would be revealed). On January 14, 2025, analysts at Truist Securities stated that their models incorporated a $225 million charge in the fourth quarter, with additional losses potentially occurring over subsequent years. On January 15, 2025, analysts at UBS similarly confirmed that they had baked a $225 million MFC charge into their models: "[w]e model a 7.7% MFC margin reflecting the next classified charge of $225mn."

**I.    The Truth Regarding the MFC and Aeronautics Programs Was Further Partially Revealed on January 28, 2025**

126.    Although Defendants had spent all year telling investors the MFC Program would only lose $325 million in 2024—including as late as December 2024—Defendants shocked investors shortly thereafter, on January 28, 2025, when they announced that the Company was forced to recognize a staggering $1.3 billion charge on the MFC Program. Making matters worse, Defendants also abruptly announced that Lockheed had recorded a charge of $410 million on the Aeronautics Program—massive, unexpected losses that Defendants never warned of.

---

[7] For example, Bernstein Research reports issued between May and July 2024 reflected models assuming total 2024 losses of $325 million in the MFC Program, explicitly noting that only $100 million had been recognized to date. As late as October 23, 2024, analysts at Morgan Stanley Research reported that they anticipated an incremental $225 million charge in the fourth quarter, bringing total 2024 losses to approximately $325 million, consistent with Defendants' statements

127.    Together, the losses in the classified MFC and Aeronautics Programs significantly reduced the Company's 2024 operating profitability and margins. The MFC segment was the most impacted—its operating profit fell from $1.54 billion in 2023 to $413 million in 2024 (a 73% decline), and its operating margin collapsed from 13.7% to 3.3%—because of the charges in the classified MFC Program. The Aeronautics segment was similarly impacted—its operating profit declined from $2.83 billion in 2023 to $2.52 billion in 2024, and its operating margin fell from 10.3% to 8.8%—because of the losses in the classified Aeronautics Program.

128.    Given Defendants' previous misrepresentations, including Defendant Malave's false and misleading statement from a month earlier that the MFC charges would be $325 million for full-year 2024, the charges in the MFC and Aeronautics Programs blindsided and shocked analysts. For example, an analyst at Morgan Stanley wrote that "classified program losses at Aeronautics and [MFC] largely took investors by surprise" because the magnitude of potential losses had not been disclosed "to this extent." An analyst from RBC echoed this sentiment that "[t]he 4Q24 results reflect larger-than-expected losses in MFC and Aeronautics." Analysts at JP Morgan flagged that the Q4 charge to the MFC Classified Program vastly exceeded their $225 million expectation. They wrote that the "booked charges" resulted in a "$1.3b charge vs the $225m in our model," and "the part of the MFC Classified Missile Program charge that was not anticipated in Q4" and the loss in the Aeronautics Program "was not in our model at all."

129.    As a direct and proximate result of this partial corrective disclosure, shares of Lockheed common stock declined $46.24 per share, over 9%, from a closing price of $503.69 on January 27, 2025 to a closing price of $457.45 per share on January 28, 2025, thereby removing some artificial inflation from the price of Lockheed common stock.

J.      **Defendants Continued Misleading Investors About Losses in the Aeronautics Program**

130.    In a misguided attempt to soften market sentiment regarding the staggering announcement of losses across the MFC and Aeronautics Programs, Defendant Taiclet misleadingly assured investors that these charges in 2024 allowed Lockheed to "***derisk the financial profile … going forward***." Regarding the Aeronautics Program specifically, Defendant Malave stated: "***we have significantly de-risked this program and significantly reduced the risk of future charges***."

131.    Analysts took Defendant Malave's reassuring representations at face value, concluding that Lockheed had successfully de-risked the business. For example, analysts at RBC stated that "[w]hile we can appreciate that this likely caught investors by surprise, we expect the financial profiles of these two classified programs to be largely de-risked, providing a cleaner setup going forward." Analysts at Truist Securities were also comforted by the representations, stating that "LMT is now confident the programs are de-risked going forward."

132.    Defendants' fraudulent narrative concerning the Aeronautics Program continued on February 13, 2025. On that date, Defendant Malave assured analysts and investors at an industry conference that the ameliorative steps taken by the Company provided Defendants with enhanced visibility into the Aeronautics Program, and that any issues related to costs were "well-contained," stating: "***I think the combination of taking a more conservative approach on the losses or the cost as well as bringing in these additional resources, adding the continuous monitoring to the program, we feel like we've got it pretty well-contained***."

133.    Defendant Malave's statement had the effect of comforting analysts, thereby softening the blow of the significant losses in the fourth quarter of 2024 and leading investors to believe that the worst was behind the Aeronautics Program. For example, analysts at TD Cowen

Research stated that "q4 was a 'cleanup' period" and analysts at Barclays stated that Lockheed: "Wipes Slate Clean with . . . MFC Charge."

134.    However, as set forth herein, Defendants' statements regarding the containment of future losses in the Aeronautics Program were false and misleading when made. In reality, Lockheed's cost-related problems were not "well-contained" or behind the Company, and Lockheed would soon declare nearly a *billion dollars more* in losses on the Aeronautics Program in 2025, which fact was known to, or recklessly disregarded by Defendants.

135.    Indeed, just weeks after making the foregoing false and misleading statements about the Company's "control" over cost issues in the Aeronautics Program, Lockheed announced the surprise resignation of Defendant Malave on April 17, 2025.

### K.    In the Midst of Massive Losses and Internal Failures, Defendant Malave Abruptly Resigned

136.    Despite his positive statements to investors about Lockheed's control over costs and future losses, continuing internal turmoil led to the sudden departure of Defendant Malave on April 17, 2025. This resignation suspiciously came on the heels of Lockheed's two disclosures to date: taking charges of $1.3 billion in the MFC Program, losses of approximately $500 million in the Aeronautics Program, and hundreds of millions of dollars of financial impacts in the F-35 Program. The timing of Defendant Malave's resignation is further suspicious based on his statements just weeks earlier that all charges related to fixed-price losses had been "well-contained."

137.    Finally, as explained below, when the full truth was revealed, the Company's new CFO, Evan Scott, stated that he had to improve Lockheed's program management controls and "increas[e] oversight" into the problems that plagued the Company during Defendant Malave's tenure.

**L.  The Full Truth Was Revealed on July 22, 2025**

138.    On July 22, 2025, the full truth emerged when Lockheed incurred losses multiples larger than previously disclosed within the Aeronautics Program. Although Defendants initially minimized problems within the Aeronautics division by attributing quarterly charges to timing issues and told investors that they had "de-risked" the Aeronautics Program, investors learned the full truth when, on July 22, 2025, Lockheed surprisingly disclosed an additional, massive $950 million loss in the Aeronautics Program—revealing that, contrary to Defendants' previous statements, the Company had not "de-risked" the program and did not have the cost-related risks "contained."

139.    On this day, Defendants admitted that "the losses on this classified program are significant" and, as a result, Lockheed was finally taking corrective action. Specifically, during the earnings call, Mr. Evan Scott, who had just taken over for Defendant Malave as the Company's CFO, admitted that the Company was going to improve on the significant deficiencies in the Company's cost analysis and risk management processes and procedures. Specifically, Mr. Scott stated:

> [A]s I've stepped into the CFO role, we've added rigor to our existing program management controls and processes[, e]ngaging subject matter experts from across the corporation, holding regular independent review teams and increasing oversight[, ]especially in cases where there are known technical complexities, contractual nuances and other unique execution challenges.

140.    Further, Defendant Taiclet and Mr. Scott admitted that the process enhancements were needed "across the portfolio," not just in the Aeronautics Program, by announcing the findings from their "comprehensive risk identification and corrective action plan" would be shared Company-wide to "ensure [Lockheed's] risk identification and mitigation efforts are optimized across [its] portfolio."

141.    These measures—which Defendants acknowledged had not previously been in place—included: (i) more comprehensive reviews of actual program performance against key assumptions embedded in estimates to complete; (ii) more continuous monitoring of technical milestones; (iii) the deployment of additional external technical resources; (iv) the engagement of subject-matter experts to address identified risk areas; and (v) the adoption of automated testing procedures to accelerate risk detection and remediation.

142.    The nature and breadth of the remedial actions Defendants announced—only after billions of dollars in losses had been disclosed—demonstrate that the deficiencies in the Company's oversight of costs and fixed-price risks were systemic and existed during the Class Period, rendering Defendants' contemporaneous assurances regarding effective risk management and cost containment materially false and misleading when made.

143.    By publicly characterizing these reforms as necessary to "optimize" risk identification, oversight, and mitigation, Defendants effectively conceded that Lockheed previously lacked adequate systems and controls to timely identify, quantify, and respond to escalating cost risks in its most complex programs. Defendants' belated adoption of these controls constitutes a compelling admission that the processes in place during the Class Period were materially inadequate.

144.    Investors were shocked and outraged by this surprise disclosure of nearly $1 billion more in losses after Defendants' previous statements assuring investors that the Company had control over the program after the surprising $555 million loss taken in the fourth quarter 2024.

145.    Indeed, the analyst reaction during the earnings call on July 22, 2025 confirms that analysts (and investors) were furious with Defendants for their previous false and misleading statements claiming they had "de-risked" the Aeronautics program. For example, an analyst from

Wolfe Research bluntly asked Defendants, "why should investors feel at all comfortable that you've de-risked the problem programs, particularly the aero[nautics] classified one." Then, after Defendant Taiclet tiptoed around the Wolfe Research analyst's question, an analyst from Bank of America followed up and asked: "Just a quick follow-on to [Wolfe Research's] question, because I don't think you answered it. Why did it take $1 billion charges to change the way you're reviewing this thing?"

146.    Following this call, analysts issued scathing reports further demonstrating that the market was reacting to the relevant truth being exposed. For example, analysts at TD Cowen explained that investors were shocked given Defendants' previous statements that they had "de-risked" the Aeronautics Program. Specifically, TD Cowen stated, "[u]nfortunately, the Q2 charges (especially on the classified Aero program), after what investors perceived to be a 'clean-up' Q4:24, moves LMT to an operational 'show me' story, in our view."

147.    Given these revelations, analysts lost all confidence in Lockheed and Defendants, who had previously misled investors about Lockheed's cost-related risk of losses. For example, RBC stated, "LMT recorded a ($950) [million] loss on a classified Aero program . . . . Management believes its program review process is more detailed after changes made since program losses in 4Q24. However, we believe the 2Q25 losses were significantly worse than expected, and we believe lower confidence in LMT's ability to execute will weigh on the stock."

148.    As a direct and proximate result of this corrective disclosure, shares of Lockheed common stock declined another $49.79 per share, or more than 10%, from a closing price of $460.53 on the prior trading day of July 21, 2025 down to a closing price of $410.11 per share on July 22, 2025, thereby removing the artificial inflation in the price of Lockheed common stock.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[8]

### A.    January 23, 2024 – Q4 2023 Earnings Call

149.    The Class Period starts on January 23, 2024. On that day, the Defendants held an earnings call with analysts and investors to discuss the Company's fourth quarter 2023 results. During the call, analysts queried Defendants regarding how Lockheed's ongoing government contracts would impact its margins. For example, an analyst from Citi Research asked Defendants for an update on the risks from Lockheed's current contracts (including its fixed-price contracts) and whether the Company is "toggling back more towards less risky programs."

150.    In response, Defendant Malave downplayed any risks from ongoing contracts and touted to investors the Company's pricing discipline and risk procedures. Specifically, Defendant Malave stated:

> The other thing that we're – just to talk about what we're thinking about contractually, and Jim has really led the way here, is that ***we just are employing a lot more pricing discipline than we have more recently***. And we're looking at things and ensuring that it's just a more analytical support for the way we approach pricing, that we capture any types of technological advantages that we may have. ***Also, as we make an assessment of risk, the contracting vehicles appropriate to that risk, but that our pricing accounts for that risk as well***. ***And so that's the way we've been approaching things for really this year going into 2024***, and I'll hand it over to Jim.

151.    Then, in response to the same question, Defendant Taiclet also downplayed the risks from ongoing classified contracts and that Lockheed had already been monitoring fixed-price

---

[8] Lead Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of Lockheed's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

risks by "matching the pricing and the risk profile within our company." Specifically, Defendant

Taiclet stated:

> Yeah. Sure, Jay. So, look, there's a near-term and a long-term approach that we're taking to government contracting with industry. ***And the near-term piece of it is a lot of what Jay [Malave] just described, really matching the pricing and the risk profile within our company***, I'll say. And I don't know what other companies are doing or how they're making their decisions. But we've recognized, and I've said to our senior customer base, look, we're in a monopsony environment here, meaning there's a single buyer for the most part for almost everything that we make or Boeing Defense makes or General Dynamics makes.
>
> And to, I guess, the government's credit in a way, they've been taking advantage of that monopsony power, if you will, over the industry. And what's happened as a result of that over the last number of years or even decades is you have lots of programs which are over cost, cost overruns, right? Whether fixed price or cost plus. And you have schedule delays, because what that monopsony environment can do is give so much power to the buyer that some of the competitors feel that there are must-win programs for them that they will take tremendous risk on cost and pricing and tremendous cost on the ability to technically deliver these capabilities.
>
> So, when you multiply those two risks together, you get a lot of cost overruns, a lot of schedule delays, programs reviewed by Congress, et cetera. So I've been advocating in the near-term and certainly implementing with our company, we don't have any must-win programs at Lockheed Martin anymore. If we have a good business opportunity with a balanced price risk profile, we will bid. If not, we will not bid. If we hit our limit parameters, we won't go beyond those. A competitor may win. So be it.

152. Defendants' statements in ¶¶150-51 were materially false and misleading because, in response to a question about the current risks from fixed-price contracts, Defendants created the misleading impression that Lockheed had adequate procedures in place to assess and monitor material contract risks, including through disciplined, selective pricing, and that as a result, the Company's existing contract portfolio reflected a balanced and controlled risk profile. These statements suggested to investors that Lockheed's financial results were not meaningfully exposed

to fixed-price or high-risk contracts and that the Company had effectively avoided the types of cost overruns and margin erosion affecting its peers.

153.    In reality, and known to or recklessly disregarded by Defendants at the time, Lockheed lacked sufficiently rigorous cost analysis and risk management procedures necessary to timely detect and respond to escalating cost pressures and fixed-price risks. As Defendants would later admit, the Company's risk-identification processes during that time failed to address escalating cost overruns and loss exposure. Indeed, it was only after disclosing billions in cost overruns that Defendants announced they were finally implementing a "comprehensive risk identification and corrective action plan" in order to "improve the performance and oversight of th[e] program." This admission demonstrates that, contrary to Defendants' statements, Lockheed did not have adequate cost analysis and risk management procedures.

154.    Moreover, unbeknownst to investors, Lockheed's lack of oversight into cost risks meant the Company remained materially exposed to substantial, quantifiable fixed-price risk arising from the legacy contracts in the classified MFC and Aeronautics Programs. These programs with fixed-price contracts were already experiencing execution challenges, cost pressure, and schedule risk that made future losses not merely possible, but foreseeable and imminent. The generalized discussion of improved pricing discipline and risk-matched bidding was a materially misleading half-truth insofar that it omitted the critical fact that these legacy contracts continued to dominate Lockheed's risk profile and posed an ongoing threat to margins, earnings, and cash flow.

155.    Because Defendants touted their risk-adjusted and conservative approach to bidding, they had a duty to disclose material facts necessary to make their statements not misleading yet failed to do so. Defendants' statements reassured investors that Defendants had

adequate cost analysis and risk management procedures and diverted investor attention away from the immediate and known risks embedded in Lockheed's existing contract portfolio. Accordingly, Defendants' statements falsely reassured investors regarding Lockheed's contract risk profile and margin sustainability, while concealing known adverse facts about legacy programs that were reasonably likely to result in substantial losses, rendering the statements materially false and misleading when made.

156.    During the same earnings call, on January 23, 2024, a Jefferies analyst asked a question about how the MFC Program in particular would impact the Company's margins. In response, Defendant Malave downplayed the risks from the classified MFC Program and stated: "*In general, across all of Lockheed Martin, . . . we're just keeping a tight lid on overhead and indirect costs and streamlining that cost structure where the opportunities exist.*"

157.    However, Defendant Malave's statement in ¶156 was false and misleading because Lockheed was not "keeping a tight lid on . . . costs," but rather, the Company had inadequate cost analysis and risk management procedures to manage costs and accurately identify and realize cost-related risks associated with the two programs. Defendant Malave's statement was also false and misleading because it conveyed to investors that Defendants had visibility into and control over the cost risks from legacy contracts (including the classified MFC and Aeronautics Programs), were actively monitoring these programs, and had largely mitigated the risk of material losses—thereby materially understating the Company's true risk exposure and misleading investors as to the actual and known risks from the classified MFC and Aeronautics Programs.

158.    Moreover, Defendants knew, but failed to disclose, that the MFC Program had already entered a fixed-price phase in which Lockheed would bear substantially increased cost risk, making future losses not merely possible, but certain to occur in the very same period that

Defendants were speaking in. Thus, Defendant Malave's statement was materially misleading because it failed to disclose the material fact that the MFC Program was structurally incapable of being remediated through the Company's purportedly more disciplined operational regime and was thus going to suffer significant losses in 2024.

159.    As described above, *see* Section IV(D)-(E), FE accounts establish that the MFC Program experienced significant cost and operational issues from its inception (prior to the Class Period) and that losses were expected during the Class Period. FE accounts further establish that while cost saving measures were discussed, they were not implemented. For example, according to FE-1, the "big" contract for the MFC program at issue was awarded in approximately 2018 and the program was expected to run for more than ten years. FE-1 recalled that at the time she joined the program in 2019, there were already discussions about implementing redesigns to lower the per unit cost to mitigate the possible costs.

### B.    February 14, 2024 – TD Cowen Aerospace & Defense Conference

160.    On February 14, 2024, during the TD Cowen Aerospace & Defense Conference, Defendant Malave further misled investors about the Company's control over cost-related risks. During the conference, the moderator asked about "any [] programs that . . . are sort of in the watch category, that you're nervous about, that could come?" In response, Defendant Malave stated that "the classified program at Aeronautics, which has fixed-price development to it, that's always a watch item for us." However, Defendant Malave then falsely claimed that, with respect to the classified Aeronautics Program, "***we continue to monitor that one pretty closely***" and further downplayed any future risks of losses from the Aeronautics Program, merely stating there was a "***possibility that a risk can surface there because it is fixed-priced development***." Defendant Malave echoed this sentiment for the MFC Program and plainly stated the Company was "***not aware of any other contracts that are below the surface [] that would cause any material issues***."

161.    Taken together, Defendant Malave's statements in ¶160 were materially false and misleading because they led investors to believe that Defendants were closely monitoring cost risks and that Lockheed's internal monitoring of those risks were adequate, when in reality, Defendant Malave knew—or was reckless in not knowing—that Lockheed had inadequate cost analysis and risk management procedures to manage costs and accurately identify and realize cost-related risks associated with the two programs. *See, e.g.,* ¶¶81-82, 101-03, 107-08, 153-54; 158-59.

162.    As Defendants later admitted at the end of the Class Period, the Company's risk-identification processes during that time failed to address escalating cost overruns and loss exposure. Indeed, it was only after disclosing billions in cost overruns that Defendants announced they were finally implementing a "comprehensive risk identification and corrective action plan" in order to "improve the performance and oversight of th[e] program." This admission demonstrates that, contrary to Defendant Malave's statements, Lockheed did not have adequate oversight processes for these programs and did not adequately monitor those programs to properly assess the risk of cost overruns.

**C.    July 23, 2024 – Q2 2024 Earnings Call**

163.    On July 23, 2024, Lockheed held an earnings call conference discussing the Company's financial results for the second quarter of 2024 (the "Q2 2024 Earnings Call"). During the Q2 2024 Earnings Call, Defendant Taiclet told investors that "[w]e ***continue to produce at a rate of 156 aircraft per year, and expect to deliver 75 to 100 aircraft in the second half of 2024***" and that the Company expected "***deliveries of F-35 aircraft to exceed production for the next few years.***" Defendant Malave also represented to investors that Lockheed "***expect[s] F-35 Lot 18 and 19 to be awarded this year, maintaining program funding, and continuity.***"

164.    Defendants' statements in ¶163 were materially false and misleading when made because they affirmatively conveyed that the F-35 Program was operating in accordance with Lockheed's production, delivery, and contracting plans, and that based on these continued plans, Lockheed would be awarded the formal contract for Lot 18 and 19. However, Defendants' statements concealed material adverse facts regarding the F-35 Program that posed a significant risk that the program's funding and continuity would be disrupted. Specifically, Defendants failed to disclose that the operational and cost issues caused by the TR-3 upgrade and Lockheed's inability to address such cost issues had already strained Lockheed's relationship with the U.S. government and delayed negotiations for the Lot 18 and 19 contract, which would delay funding and cause material financial harm to the Company's 2024 profitability. Accordingly, by highlighting continued program funding and continuity, Defendant Malave presented a misleadingly positive picture of the F-35 Program.

165.    Indeed, at the time, Defendants knew that F-35 deliveries were already substantially delayed—by more than 230 days—due to TR-3 implementation failures and higher than anticipated costs. This was not a speculative or future risk, but a current and known condition directly affecting the Company's reported performance and forward-looking delivery expectations. Accordingly, by selectively highlighting production rates, supplier coordination, and anticipated contract awards—while omitting known facts about the magnitude and persistence of delivery delays and rising costs—Defendants presented a partial and misleading account of the F-35 Program's operational status. These omissions rendered Defendants' statements materially false and misleading when made because reasonable investors would have viewed the undisclosed delivery delays and TR-3 failures as significantly altering the total mix of information concerning Lockheed's revenues, cash flows, and execution risk.

D.      **October 22, 2024 – Q3 2024 Earnings Call**

166.    On October 22, 2024, Lockheed held an earnings call conference discussing the Company's financial results for the third quarter of 2024. During the call, an analyst asked Defendant Malave the following question about losses in the MFC Program:

> Jay, I was hoping to get some more help from you on the MFC margin. Do the last two quarters suggest the operating performance is better, or is it just that the loss accrual is loaded into the fourth quarter? And I guess remind me why the accounting is that way as opposed to taking it all when you know you have it and I don't know if you could talk about how you expect that to progress through 2025. But I guess, just fundamentally, like is the new classified program or the overall operating performance in the segment, is it improving or worsening, or is it just the volatility is accounting?

167.    In response, Defendant Malave stated:

> Yeah. I would say the volatility is accounting. I would say in this year-to-date, their performance is better than prior year. We've seen an improvement. When you put aside the losses related to the classified program, their profit adjustments year-to-date have shown growth. And they're performing I think pretty well in the base. So, this was a good quarter as an example. We didn't really record any losses related to the classified program and we delivered 14.4% margins in the quarter. And that's essentially where they're operating this year, ex-the losses. ***You got it right as far as timing, we would expect – we recorded $100 million in the first quarter. So that would say that about $225 million we record or what's included in our guidance for the fourth quarter.***

168.    Defendant Malave also spoke to investors about potential losses on the MFC Program moving forward into 2025 and beyond. He stated, "***[a]s far as 2025, a baseline assumption would be that we – you go from $325 million to anywhere between, say, $250 million to $300 million in losses in 2025, assuming a one-per-year type of framework.***"

169.    Defendant Malave's statements in ¶¶167-68 were materially false and misleading when made because they affirmatively misrepresented the magnitude and timing of upcoming and known losses in the MFC Program and falsely conveyed that potential remaining losses were both

limited and largely deferred beyond 2024. Specifically, Defendant Malave told investors that only approximately $225 million of additional losses remained to be recorded in 2024, with further losses of approximately $250–$300 million to be incurred gradually in 2025. These statements led reasonable investors to believe that: (i) the worst of the losses had already been recognized, (ii) the remaining exposure was controlled and manageable, and (iii) the Company had reliable visibility into both the total amount and timing of future losses.

170.     In reality, and known to or recklessly disregarded by Defendants at the time, the MFC Program would need to recognize substantially larger losses in 2024 than Defendant Malave had stated. Instead of disclosing the full truth, as he is required to under the federal securities laws, Defendant Malave affirmatively provided both an untrue ceiling and temporal distribution of imminent losses. By understating both the material scale and immediacy of the MFC Program's losses, Defendant Malave materially misled investors about the Company's true financial condition and risk exposure.

171.     Moreover, Defendant Malave knew that the MFC Program had already entered a fixed-price phase in which Lockheed would bear substantially increased cost risk, making future losses not merely possible, but certain to occur in the very same period that Defendant Malave was speaking in. Indeed, FE accounts establish that the MFC Program experienced significant cost and operational issues from its inception (prior to the Class Period) and that losses were expected during the Class Period. *See* ¶¶81-82, 101-03, 107-08.

### E.     December 3, 2024 – UBS Global Industrials and Transportation Conference

172.     On December 3, 2024, Defendant Malave attended the UBS Global Industrials and Transportation Conference. During the conference, an analyst asked Defendant Malave a question about margin expansion. In response, Defendant Malave went as far as to tell investors they should expect *lower* losses on the MFC Program moving forward. Specifically, Defendant Malave stated:

Number one, we should get a mix benefit just from MFC as there – as they're highest grower in our business to the most profitable as well. So, that we should get a mix benefit from MFC driving this over the next few years. ***We'll also should get a benefit from lower losses from the MFC classified program that we're under – we're delivering out now. And so that will give us a little bit [of a] tailwind.*** And so you kind of do this in the context of 2025, that's 20 basis points of benefit.

173.    Defendant Malave's statement in ¶172 was materially false and misleading for the reasons stated in ¶169-71. Defendant Malave's statement was further false and misleading when made because it affirmatively portrayed the MFC Program as an impending "tailwind" allowing for future margin expansion in the MFC segment at a time when Defendants knew that the MFC program would disclose losses of $1.3 billion in fourth quarter 2024—the *very same quarter* that Defendant Malave was speaking in—which would destroy the Company's margins, not improve them.

174.    By telling investors that they should expect "lower losses from the MFC classified program," and that those reduced losses would provide a "tailwind," Defendant Malave conveyed that: (i) the worst losses were already behind the Company, (ii) remaining exposure was declining, and (iii) the program was transitioning from a drag on performance (i.e., a headwind) to a tailwind. Defendant Malave's statements were not vague expressions of optimism, but specific, directional assertions about the trajectory and financial impact of a known problem program.

175.    In reality, and known to or recklessly disregarded by Defendant Malave at the time, the MFC Program was not producing "lower losses," nor transitioning into a tailwind. Rather, it was already at the point at which Lockheed would be required to recognize the full remaining losses associated with the program of $1.3 billion, all of which would be recorded in the fourth quarter of 2024. Moreover, when Defendant Malave spoke on December 3, 2024, it was a mere 28

days from the conclusion of the very quarter in which the losses were declared, rendering his description of the program as a future margin benefit materially misleading.

176.    Defendant Malave's statements were further materially misleading because, having chosen to characterize the MFC Program as improving and accretive, he had a duty to disclose the known, contrary facts—namely, that recognition of the remaining losses was imminent and material to the Company's profitability. Defendant Malave's failure to disclose these material facts deprived investors of critical information necessary to evaluate Lockheed's outlook and financial condition heading into the Company's 2024 results.

### F.    January 28, 2025 – Q4 2024 Earnings Call

177.    On January 28, 2025, Lockheed held an earnings call conference discussing the Company's financial results for the fourth quarter of 2024 ("Q4 2024 Earnings Call"). During that call, Defendant Taiclet addressed the massive $1.7 billion charges across the classified MFC and Aeronautics Programs, claiming that those charges allowed the Company to "derisk the financial profile of both these critical national security programs." Specifically, Defendant Taiclet told investors:

> *Recording charges in Q4 on these two programs enabled us to derisk the financial profile of both these critical national security programs going forward, as we move into their next phases. While these particular contracts were struck a number of years ago, there are no longer any must-win competitions. Under today's Lockheed Martin wide bid process, every proposal adheres to a stringent, risk-adjusted ROI regime. This process is designed to compete aggressively for key opportunities, while also being very committed to achieving positive results, both in the short and long term for our shareholders.*

178.    During the same earnings call on January 28, 2025, an analyst asked Defendant Malave about the risk of future losses within the Aeronautics Program. Specifically, the analyst asked the following question:

Good morning. I wanted to ask, Jay, emphasized kind of the … derisking nature charges in Q4. I know maybe it's difficult to discuss because it's classified. But within Aeronautics, all of the filing language has sort of emphasized continued risk there. Should we think that within – following this charge, the potential for future charges there has really come down considerably? And is there anything you can say about where we might be in the life cycle of that program and when it might be able to provide some positive returns? And then thinking maybe that the answer to there might have to be a little bit circumspect. If you could just comment on the multi-year targets that you gave on the last call, and how to think about those now?

179.    Defendant Malave responded by falsely reassuring investors that there was little risk of future charges in the Aeronautics Program given Defendants' purported actions to address those risks. Specifically, Defendant Malave stated:

Okay. Thanks, Seth. There's about 16 questions in that one question, but I'll take a shot at all of them. ***Just as far as the risk, I would say we significantly reduced the risk.*** I can't really get into the life cycle of the program, given the classified nature of it. But let me walk you through why I believe that we've significantly reduced the risk. As you know, we had realized this risk earlier in the year, causing us to perform a more comprehensive review of current performance versus our key assumptions included in the estimate to complete. We evaluated the risk and opportunities and made the determination that a cost reset was warranted. The amount route that we recorded in the quarter is the most conservative assessment we've made to-date. We've also made a number of process changes. Aeronautics, along with our corporate staff, have implemented a more continuous monitoring process of the progress of this program in terms of technical milestones and added technical resources from the outside the program. This will enable both teams to work together to institute support measures as needed faster than before. We've also added technical resources and experts with experience in the risk areas to help bolster the team and mitigate risks as they arise. We've added automated testing procedures as well to accelerate test results and issue resolution should they occur. So, all those things taken together give us confidence that ***we have significantly de-risked this program and significantly reduced the risk of future charges on this.***

180.    Defendant Malave's statements in ¶177 and ¶179 were materially false and misleading when made because they affirmatively represented that the Q4 2024 charges had "de-

57

risked" Lockheed's financial profile and significantly reduced the likelihood of future fixed-price charges. In reality, however, Lockheed still had inadequate cost analysis and risk management procedures and controls to manage costs and accurately identify and realize cost-related risk, and therefore, material additional losses remained probable and unavoidable in the Aeronautics Program.

181.    By stating that recording the Q4 charges had "enabled us to derisk the financial profile" of the programs, even though Lockheed did not have adequate cost analysis and risk management controls, Defendant Malave at a minimum recklessly told investors that the Company had de-risked the Aeronautics Program, thereby assuring investors that the losses were behind the Company even though Lockheed was primed to incur losses more than double the size of the Q4 2024 charges announced on January 28, 2025. The assertion that the programs had been "significantly de-risked" was therefore false and misleading when made, because the underlying cost, schedule, and execution problems had not been resolved and were continuing to deteriorate notwithstanding the Q4 2024 charges.

182.    Accordingly, by assuring investors that the programs had been "significantly de-risked" and that the Q4 charges reflected a "conservative" reset—when substantially larger losses would still have to be recognized—Defendants presented a false narrative of containment and control. These statements materially understated Lockheed's true financial exposure to the Aeronautics Program and rendered Defendants' disclosures materially false and misleading when made.

**G.    February 13, 2025 – TD Cowen Aerospace & Defense Conference**

183.    On February 13, 2025, Defendants attended the TD Cowen Aerospace & Defense Conference. In response to a question regarding the recently announced losses in certain programs,

Defendant Malave stated the Aeronautics Program was "well-contained" based off Defendants ameliorative efforts and visibility into the program, stating:

> And so the $410 million charge was the most conservative assessment of our risk in that program to date. I know people are saying, well, other companies, that's what they said. You guys said de-risk. Other companies have said that and look at what's going on. It's just like it just keeps on dripping.
>
> What I can say there is that, again, I can't speak in absolutes. There's no such thing as absolutes, but I feel confident that we did the most comprehensive analysis based on all available data that we have at this point in time. And we made the most conservative assessment that went into that charge in the fourth quarter.
>
> Secondly, what we've done is we put just other steps in place. So, we have more of a continuous monitoring program, which consists of resources outside the program, including resources outside of aeronautics as well, which will make a more continuous review of the program, where they are, and it can give a little bit more early warning to the extent that they seem to be falling off-track. What they can do, we've added additional technical resources both executive and non-executive resources to support these areas that we have identified as risk to help them get through some of the challenges that they have. And then we've also added things like automated testing in certain areas. And so, ***I think the combination of taking a more conservative approach on the losses or the cost as well as bringing in these additional resources, adding the continuous monitoring to the program, we feel like we've got it pretty well-contained.***

184.    Defendant Malave's statements in ¶183 were materially false and misleading when made for the reasons set forth in ¶180-82. Defendant Malave's statements were further materially false and misleading when made because they affirmatively assured investors that losses in the Aeronautics Program were "well-contained," that Lockheed had a "pretty good handle on the cost," and that the $410 million charge represented the Company's "most conservative assessment" of risk, when in reality, Defendants knew or recklessly disregarded that material additional losses remained probable and imminent. Indeed, rather than having the losses and cost risks "well-contained," Lockheed still had inadequate cost analysis and risk management

procedures to monitor cost overruns in the Aeronautics Program (which Defendants would themselves admit on July 22, 2025), which would lead to losses more than double the size of the Q4 2024 charge.

## VI.    LOSS CAUSATION/ECONOMIC LOSS

185.    Defendants' materially false and misleading misstatements and omissions alleged herein directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members. Defendants' materially false and misleading misstatements and omissions were widely disseminated to the securities markets, investment analysts, and the investing public and had the effect of creating unrealistically positive assessments and characterizations of Lockheed and its business, operations, and results which caused the Company's common stock to be overvalued and artificially inflated throughout the Class Period. Lead Plaintiffs and other Class members purchased or otherwise acquired Lockheed common stock at prices artificially inflated by Defendants' materially false and misleading misstatements and omissions of material fact alleged herein.

186.    During the Class Period, Defendants publicly issued materially false and misleading statements and/or omissions of material facts regarding, among other things, Lockheed's cost analysis and risk management procedures, the risk of losses from the MFC, Aeronautics, and F-35 Programs, and Lockheed's purported control over cost risks and losses from fixed-price contracts. Had Defendants been truthful about these matters during the Class Period, such risks and downsides would have been accurately reflected in Lockheed's share price. Accordingly, Lead Plaintiffs and other Class members unknowingly purchased or otherwise acquired their shares of Lockheed common stock at the artificially inflated prices at which they were offered based on Defendants' precipitation of false information lacking material information required to be disclosed.

187.    As certain relevant and true facts became known and/or the risks previously concealed by Defendants' material misstatements and omissions materialized, the artificial inflation was removed from the price of Lockheed's common stock, causing the losses of Lead Plaintiffs and other Class members. The timing and magnitude of Lockheed's common stock price declines negate any inference that the losses suffered by Lead Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to the Defendants' fraudulent conduct.

188.    Specifically, on October 22, 2024, January 28, 2025, and July 22, 2025, the material risks, financial impacts, and relevant truth concealed by Defendants' materially false and misleading misstatements and omissions concerning the imminent and known losses within the MFC Program, Aeronautics Program, and F-35 Programs were revealed as discussed herein. Indeed, each of these partial corrective disclosures, discussed herein, partially revealed the relevant truth and foreseeable risks previously misrepresented and/or concealed by Defendants' materially false and misleading statements and omissions.

**A.    October 22, 2024 – First Partial Corrective Disclosure/Materialization of the Risk**

189.    On October 22, 2024, Defendants partially revealed the truth concerning the financial impact of modernization and software delays associated with the F-35 Program, as well as the cost pressures and supply-chain impacts tied to those delays. Defendants also partially revealed—though still materially understated—the truth concerning the existence of significant losses in the fixed-price phase of the classified Aeronautics Program.

190.    Before the market opened on October 22, 2024, Lockheed issued a press release announcing its third quarter 2024 results. In that release, the Company disclosed that it had to take an $80 million loss from the classified Aeronautics Program because of "higher than anticipated

costs to achieve program objectives." This disclosure partially revealed the falsity of Defendants' prior statements touting the Company's conservative bidding strategy and assuring investors that risks in the classified Aeronautics programs had been identified, quantified, and conservatively reserved.

191.    With respect to the F-35 Program, Lockheed disclosed for the first time that contract negotiations for Lot 18 and 19 had been delayed because program costs had exceeded the advance acquisition contract value. As a result, the Company was unable to recognize revenue or profit on approximately $400 million in incurred costs, experienced at least $300 million in additional supply-chain impacts, and suffered approximately $450 million in lost sales because it could not invoice or collect cash from the U.S. government while negotiations remained unresolved.

192.    The market immediately recognized the significance of these disclosures and tied them to Defendants' prior false and misleading statements. For example, analysts at Bernstein Research stated that the "most negative result" from the announcement was "a miss in Aeronautics due to F-35, driven by delays in authorization on Lot 18 and 19 contracts and ongoing TR-3 issues." Analysts also concluded that the F-35 disclosures represented a material adverse overhang on Lockheed's financial outlook. Analysts at UBS wrote that the delayed Lot 18 and 19 award "reintroduces some risk around that program," noting that continued negotiations had already caused a $700 million revenue impact and a $400 million cash impact in the third quarter. Similarly, analysts at Washington Analysis stated that the earnings call signaled that Lot 18 and 19 negotiations would "likely stretch into 2025," contrary to Defendants' prior assurances of near-term resolution and funding continuity.

193.    Market participants also expressed surprise at the emergence of losses in the classified Aeronautics Program. Analysts at Deutsche Bank Research wrote that the $80 million loss was inconsistent with their expectations and raised "incremental concern . . . going forward," reflecting that the disclosure corrected investors' understanding of the program's risk profile.

194.    As a direct and proximate result of this partial corrective disclosure and materialization of the concealed risk, shares of Lockheed's common stock declined $37.63 per share, or more than 6%, from a closing price of $614.61 on October 21, 2024, to a closing price of $576.98 on October 22, 2024.

195.    Rather than fully correct their prior misstatements, Defendants attempted to stem further stock-price decline by continuing to downplay risks in the classified programs. Defendants did not disclose that losses in the Aeronautics and MFC Programs were multiples larger than previously represented, thereby prolonging artificial inflation by leading investors to believe that management maintained adequate visibility into costs and risks.

**B.    January 28, 2025 – Second Partial Corrective Disclosure/Materialization of the Risk**

196.    On January 28, 2025, the truth regarding Defendants' long-running failure to disclose the true magnitude and immediacy of losses in the classified MFC and Aeronautics Programs was further revealed.

197.    Prior to that date (and indeed as late as December 3, 2024), Defendants had repeatedly and consistently represented that losses in the MFC Program were capped at approximately $325 million for 2024, and that any additional losses—potentially totaling up to $1 billion—would occur gradually, year-over-year, depending on whether fixed-price options were exercised in future years. However, on January 28, 2025, Defendants disclosed for the first time that Lockheed had losses of approximately $1.3 billion in the MFC Program in the fourth quarter

of 2024. This disclosure directly contradicted Defendants' prior representations that losses were capped at $325 million in 2024, were declining, and the remaining losses would be spread gradually over time.

198.    Compounding the surprise, Defendants also disclosed for the first time that losses in the Aeronautics Program were far more severe than previously expected by the market, who had relied on Defendants' previous false and misleading statements regarding, inter alia, Lockheed's cost analysis and risk management procedures and Defendants' supposed close monitoring of fixed-price risks. *See, e.g.,* ¶160. Defendants provided no warning whatsoever that additional losses were likely or imminent in the Aeronautics Program. Rather, on January 28, 2025, Defendants revealed quarterly losses of an additional $410 million (bringing full-year 2024 losses to $555 million).

199.    Analysts and investors were blindsided by the combined $1.7 billion in losses across the MFC and Aeronautics programs. Analysts at Morgan Stanley Research wrote that the losses "largely took investors by surprise," noting that while some MFC charges had been anticipated, losses had not been disclosed "to this extent." Analysts at RBC similarly reported that fourth-quarter results reflected "larger-than-expected losses" in both MFC and Aeronautics. Analysts at J.P. Morgan emphasized that the $1.3 billion MFC charge vastly exceeded their $225 million expectation, explaining that approximately $1.1 billion of the charge was entirely unanticipated. Analysts at Bernstein Research likewise attributed the $1.7 billion in charges to cost overruns in Aeronautics and MFC, confirming that the disclosure corrected the market's understanding of the programs' true risk profiles.

200.    The Aeronautics losses, in particular, shocked the market. Analysts at Deutsche Bank stated that the $405 million incremental Aeronautics charge had not been "previewed," while

analysts at J.P. Morgan characterized the charge as "unplanned" and "not in [their] model at all," underscoring that Defendants had failed to provide any meaningful warning.

201.    As a direct and proximate result of this partial corrective disclosure and materialization of previously concealed risks, shares of Lockheed common stock declined $46.24 per share, over 9%, from a closing price of $503.69 on January 27, 2025 to a closing price of $457.45 per share on January 28, 2025, thereby removing some artificial inflation from the price of Lockheed common stock.

202.    Rather than fully correcting the truth, Defendants attempted to arrest the stock's decline by issuing fresh assurances that the surprise charges had eliminated future risk. On January 28, 2025, Defendants stated that they had performed a "comprehensive review" of the Aeronautics Program and that the charges had "de-risked" the financial profile of the classified programs. These assurances temporarily blunted negative analyst sentiment. For example, analysts at TD Cowen described the fourth quarter as a "cleanup" period; a Barclays Research report declared that Lockheed had "wipe[d the] slate clean" with the MFC charge; analysts at RBC stated that the programs appeared "largely de-risked"; and analysts at Truist Securities and J.P. Morgan echoed management's representations that the charges had resolved the overhang and that additional resources and monitoring gave them increased confidence.

203.    As later disclosures revealed, however, Defendants' assurances were themselves false and misleading, and served only to prolong artificial inflation until the final corrective disclosure.

### C.    July 22, 2025 – Third Partial Corrective Disclosure/Materialization of the Risk

204.    On July 22, 2025, the full truth and foreseeable risks regarding Lockheed's exposure to fixed-price risk and inadequate cost analysis and risk management procedures were

revealed and materialized. Whereas Defendants had previously minimized and withheld problems in the Aeronautics Program—characterizing earlier losses as timing issues, isolated events, or the result of conservative "de-risking"—Lockheed stunned investors by disclosing an additional $950 million loss in the Aeronautics Program, revealing that prior assurances had materially understated both the severity and persistence of the Company's execution failures.

205.    This disclosure marked a sharp departure from Defendants' prior representations that the fourth-quarter 2024 charges constituted a one-time "cleanup" and that enhanced monitoring and oversight had contained further risk. Analysts immediately recognized the significance of the reversal. Analysts at TD Cowen wrote that, "[u]nfortunately, the Q2 charges (especially on the classified Aero program), after what investors perceived to be a 'clean-up' Q4:24, moves LMT to an operational 'show-me' story," underscoring that the July 22, 2025 disclosure corrected investors' understanding of the Company's operational trajectory.

206.    Indeed, analyst reaction during the earnings call that same day confirms that investors were reacting to the revelation of the relevant truth and were upset with Defendants for their previous false and misleading statements claiming they had "de-risked" the Aeronautics program. For example, an analyst from Wolfe Research bluntly asked Defendants, "why should investors feel at all comfortable that you've de-risked the problem programs, particularly the aero[nautics] classified one." Then, after Defendant Taiclet tiptoed around the Wolfe Research analyst's question, an analyst from Bank of America followed up and asked: "Just a quick follow-on to [Wolfe Research's] question, because I don't think you answered it. Why did it take $1 billion charges to change the way you're reviewing this thing?"

207.    Moreover, analyst coverage following the earnings call further confirmed that the market was reacting to new information revealing the depth and breadth of Lockheed's cost

infirmities across its Aeronautics Program. Analysts at J.P. Morgan described the approximate charges to the Aeronautics Program as "the big news of the quarter," noting that although management claimed to be bringing heightened focus and oversight, the situation was now "a show-me [story] for the market." Similarly, analysts at Truist Securities expressed surprise, stating that the charges were "far larger and broader in scope than we had expected," and warning that additional charges could materialize as oversight and controls were expanded. Analysts at RBC similarly characterized the losses as "larger-than-expected," and explicitly downgraded confidence in Lockheed's execution capabilities, noting that the $950 million Aeronautics loss reflected significantly worse-than-expected performance that would weigh on the stock.

208.    The magnitude of the July 22, 2025 charge further demonstrated that Defendants' prior "warnings" had been materially watered down. Analysts at J.P. Morgan stated that although investors had expected a charge related to the Aeronautics classified program, "the magnitude was bigger than anticipated." Analysts at UBS similarly reported that the combined charges produced a $1.6 billion segment EBIT impact, exceeding analyst expectations that had been significantly lower based on Defendants' false and misleading statements. TD Cowen likewise emphasized that the "magnitude of the charge is much larger than expected," confirming that the disclosure revealed new and previously concealed information.

209.    As a direct and proximate result of this corrective disclosure and materialization of previously concealed risks, shares of Lockheed common stock declined another $49.79 per share, or more than 10%, from a closing price of $460.53 on the prior trading day of July 21, 2025 down to a closing price of $410.11 per share on July 22, 2025, thereby removing the artificial inflation in the price of Lockheed common stock.

**VII.    ADDITIONAL INDICIA OF SCIENTER**

210.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Lockheed's and their materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated in or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is furthered by the following facts.

**A.    Defendants' Admissions Support an Inference of Scienter**

211.    On July 22, 2025, Defendants announced sweeping remedial measures to the Company's cost analysis and risk management procedures, thereby admitting that the Company's risk-identification and monitoring processes did not sufficiently address escalating cost overruns and loss exposure during the Class Period. Indeed, it was only after belatedly disclosing billions in cost overruns that Defendants announced they were finally implementing a new comprehensive risk identification and corrective action plan designed to improve performance and prevent further outsized risks.

212.    During the earnings call on July 22, 2025, Defendant Taiclet admitted that following Defendant Malave's exit, the Company did a comprehensive review of the program and determined the Company needed to implement a "comprehensive risk identification and corrective action plan" in order to "improve the performance and oversight of th[e] program." Indeed, the Company admitted that the performance issues caused the Company to implement "significant changes . . . [and] updates to the program's schedule and cost estimates." Specifically, the Company admitted:

Challenges and performance issues continued into 2025 and had a greater impact on schedule and costs than previously estimated. As a result, Aeronautics performed a comprehensive review of its design, integration, test, and other processes to achieve the technical requirements of the program, which was completed in the second quarter of 2025. Based on this review and ongoing discussions with the customer and suppliers, Aeronautics made significant changes to its processes and testing approach, resulting in significant updates to the program's schedule and cost estimates.

213.    Defendants' belated adoption of these controls constitutes a compelling admission that the processes in place during the Class Period were materially inadequate—thereby contributing to an inference that Defendants knowingly or recklessly misled investors about the Company's supposed control over rising costs and the risks to Lockheed's business. By publicly characterizing these reforms as necessary to "optimize" risk identification, oversight, and mitigation, Defendants implicitly conceded that Lockheed previously lacked the systems and controls required to timely identify, quantify, and respond to escalating cost risks in the programs—which adds to the inference that Defendants made their statements either knowingly or with severe recklessness.

**B.    Defendant Malave's Departure Supports an Inference of Scienter**

214.    The timing and circumstances of Defendant Malave's departure, a key senior executive with direct responsibility for the Company's financial reporting and intimate knowledge of Lockheed's operations, including the MFC, Aeronautics, and F-35 Programs, is highly suspicious and further supports a strong inference of scienter.

215.    On April 17, 2025, Lockheed publicly announced that Defendant Malave had advised the Company of his intention to pursue opportunities outside the Company. Notwithstanding Lockheed's explanation for the departure, Defendant Malave's resignation occurred in close temporal proximity to the extraordinary disclosure revealing substantial and previously undisclosed losses in the Aeronautics Program. His resignation also came directly

before Defendants belatedly admitted that Lockheed needed significant improvements to the Company's cost analysis and risk management procedures.

216.    Indeed, shortly after Defendant Malave's abrupt departure, Defendant Taiclet admitted the Company conducted a comprehensive review of the Company's risk management procedures and determined that they needed to significantly "improve the performance and oversight . . . of this program under a comprehensive risk identification and corrective action plan." This is strong evidence that Defendant Malave's departure is connected to his false and misleading statements about the Company's supposed control over rising costs and the fixed-price risks to Lockheed's business.

217.    The timing of Defendant Malave's departure is particularly suspicious because, instead of improving the cost analysis and risk management procedures (which were inadequate at that time) or accurately informing investors of the ongoing challenges, Defendant Malave waited, left Lockheed for a new opportunity, and let the new CFO handle it and clean up the mess. Moreover, Defendant Malave's departure was directly after his own public statements minimizing the Company's exposure to future fixed-price contract losses falsely assuring investors that Lockheed's known fixed-price charges, including within the classified Aeronautics Program, were "well-contained." Yet, just weeks after Defendant Malave's statements and his unexpected departure, Lockheed disclosed that material adverse developments were continuing and that additional financial impacts were still emerging within the classified Aeronautics Program. Specifically, on July 22, 2025, the Company announced that it recorded an additional $950 million loss in the classified Aeronautics Program, confirming that the operational and financial issues previously downplayed by Defendant Malave were ongoing rather than resolved or contained.

218.    When considered holistically and in combination with: (i) Defendant Malave's repeated public assurances regarding loss containment; (ii) the magnitude and persistence of the subsequently disclosed financial impacts; and (iii) the remedial measures taken by the Company directly after his departure, the circumstances surrounding Defendant Malave's departure further support a strong inference that he acted knowingly or with severe recklessness.

C.    **Defendants' Own Statements Themselves Support an Inference of Scienter**

219.    The Individual Defendants spoke at length during the Class Period about the Company's contract bidding practices, ability to assess risk, and visibility into the relevant contracts—demonstrating that they were aware of or, at the very least, were reckless in not knowing the true impact the Company's aggressive bidding and inability to properly monitor and assess risk would have on Lockheed's business.

220.    Throughout the Class Period, Defendants did not disclaim uncertainty or lack of insight. Instead, they repeatedly represented that they had direct visibility into program performance, had identified and quantified risks, and were actively monitoring execution through enhanced processes and personnel. These statements—made repeatedly, confidently, and with increasing specificity—render implausible any claim that Defendants were unaware of the adverse facts they concealed.

1.    **Defendants' Touted Superior Risk Assessment and Asserted Visibility into the MFC and Aeronautics Programs**

221.    At the outset of the Class Period, the Individual Defendants affirmatively represented that Lockheed had already implemented analytical pricing discipline and appropriately matched risk to contract structure. For example, on January 23, 2024, during an earnings call discussing fourth quarter 2023 results, Defendants responded to analyst questions about how ongoing government contracts, including fixed-price contracts, would affect margins. Defendant

Malave stated that Lockheed was: "***employing a lot more pricing discipline… ensuring that it's just a more analytical support for the way we approach pricing… [and] that our pricing accounts for that risk as well***."

222.    Defendants also affirmatively stated that they reviewed costs from the MFC and Aeronautics Programs. For example, on February 14, 2024, Defendant Malave misleadingly discussed losses to the classified Aeronautics Program in 2021 and stated that Defendants "***continued to monitor that one pretty closely***." Similarly, with respect to the MFC Program, Defendant Malave claimed they were "***keeping a tight lid on overhead and indirect costs and streamlining that cost structure where the opportunities exist***."

223.    These statements demonstrate scienter because Defendants answered direct questions about the fixed-price risks from the classified MFC and Aeronautics Programs and claimed they monitored the risks "closely." Thus, the Individual Defendants either knew their statements were false and misleading or were reckless in making them despite contrary information.

224.    Moreover, these statements support an inference that Defendants were aware of—yet failed to disclose—the Company's exposure to fixed-price risk and related systemic execution failures. Not only do the Individual Defendants' statements reflect knowledge of the risks from the MFC and Aeronautics Programs, but their statements reflect intimate knowledge of the Company's current risk landscape—or, at minimum, reckless disregard for known contrary information.

### 2.    Statements Regarding Current F-35 Program

225.    On July 23, 2024, during the Q2 2024 earnings call, the Individual Defendants made detailed statements about the operational status of the F-35 Program, including production rates, delivery expectations, supplier readiness, and contract awards. Defendant Taiclet told

investors that "*[w]e continue to produce at a rate of 156 aircraft per year, and expect to deliver 75 to 100 aircraft in the second half of 2024*" and that the Company expected "*deliveries of F-35 aircraft to exceed production for the next few years.*" Defendant Malave also represented to investors that Lockheed "*expect[s] F-35 Lot 18 and 19 to be awarded this year, maintaining program funding, and continuity.*"

226.    The Individual Defendants' statements claimed real-time insight into current and expected F-35 production. By emphasizing such insights, the Individual Defendants represented that they were closely scrutinizing the F-35 Program. This creates a strong inference that the Individual Defendants knowingly or recklessly misrepresented the program's true status insofar that continued delays and cost overruns had materially delayed F-35 contract negotiations.

### 3.    Defendants Quantified Loss Exposure in the MFC Program While Claiming Visibility into Timing and Trajectory

227.    On October 22, 2024, Defendant Malave affirmed previous statements regarding 2024 losses attributable to the MFC Program, evidencing his knowledge and involvement with the program. Specifically, Defendant Malave stated that: (i) remaining 2024 losses were limited to approximately $225 million; and (ii) additional losses in 2025 would be approximately $250–$300 million, spread over time. Even more indicative of Defendant Malave's knowledge, on December 3, 2024, Defendant Malave told investors they should expect: "lower losses from the MFC classified program … [which] will give us a little bit [of a] tailwind."

228.    These statements are probative evidence of scienter because Defendant Malave did not hedge uncertainty; he spoke with precision. Indeed, Defendant Malave provided precise figures and timing. Such specificity reflects access to detailed internal estimates and program forecasts. Moreover, Defendant Malave's statements infer that the Individual Defendants' monitoring of the MFC Program was ongoing and granular. Finally, the proximity of Defendant Malave's December

2024 statement to the January 2025 charge of $1.3 billion to the MFC Program supports a strong inference that he spoke contrary to known facts.

### 4.    Statements that Lockheed's Financial Profile Had Been De-Risked

229.    In response to investor outrage at the January 2025 charges to the MFC and Aeronautics Programs, the Individual Defendants stated that charges taken had "de-risked" the financial profile of the classified programs and Lockheed as a whole. Statements regarding these ameliorative measures lend to an inference of scienter regarding the Individual Defendants' knowledge as to the inner workings of these programs.

230.    For example, on January 28, 2025, Defendant Malave affirmed that Lockheed's financial profile had been de-risked and that the following additional measures had been put in place to bolster program visibility: (i) conducted comprehensive reviews of assumptions; (ii) implemented continuous monitoring; (iii) added internal and external technical experts; and (iv) enhanced automated testing and milestone tracking.

231.    Likewise, on February 13, 2025, Defendant Malave stated that losses were "well-contained" and that management had a "***pretty good handle on the cost***" going forward based on, among other things, "***taking a more conservative approach on the losses or the cost[,] . . . bringing in [] additional resources, [and] adding [] continuous monitoring to the program***."

232.    The Individual Defendants' statements were irrefutable as to their first-hand knowledge regarding the monitoring and purportedly curative efforts employed to enhance visibility into fixed-price risk. By emphasizing monitoring, resources, and process controls, the Individual Defendants represented that they were closely tracking program performance. When nearly a billion dollars in additional losses were later disclosed, these assurances strongly support the inference that the Individual Defendants either knew their statements were false or were reckless in making them despite contrary information.

D.    **Lockheed's MFC, Aeronautics, and F-35 Programs Were Critical to the Company's Business**

233.    The Individual Defendants' knowledge of materially adverse financial impacts within the F-35 Program and charges from the MFC and Aeronautics Programs can be further inferred because these programs are critical to the Company's current and future core operations.

234.    Indeed, the F-35 Program has represented approximately a quarter of Lockheed's revenues since 2017 and 26% of its revenue in 2023, the year prior to the Class Period. Throughout the Class Period, Defendants repeatedly acknowledged in Lockheed's SEC filings that the F-35 Program was the Company's largest program, generating approximately 25–26% of the Company's consolidated revenues and a majority of revenues within the Aeronautics segment. For example, in Lockheed's 2024 annual report on SEC Form 10-K, Defendants stated that the F-35 was "our largest program" and disclosed that it accounted for approximately 26% of consolidated revenues and approximately 65% of Aeronautics segment revenues (the Company's largest business segment). Lockheed reiterated this characterization in its quarterly reports throughout the Class Period, again describing the F-35 Program as "our largest program" and quantifying its material contribution to consolidated revenues.

235.    The operational issues underlying the October 22, 2024 loss announcement—including production lot timing, contractual authorization delays, and technology upgrade execution problems—went directly to the core mechanics of the F-35 Program and to Lockheed's ability to generate revenues and control costs. This is especially so given the Lot 18 and 19 contracts were valued at $24.3 billion and were therefore crucial to Lockheed's continued financial viability. Moreover, Lockheed's ability to implement combat-ready TR-3 upgrades was similarly critical to the Company's operations given it was mandatory to retain the F-35 Program.

236. Indeed, Defendants acknowledged that unresolved F-35 production and upgrade matters were negatively affecting earnings and cash flow until resolved in its October 22, 2024 quarterly report on SEC Form 10-Q. Specifically, Defendants disclosed that delays in contractual authorization and funding for certain F-35 production lots, together with execution challenges associated with technology upgrades, were adversely impacting Aeronautics segment profitability and cash generation.

237. Likewise, the MFC and Aeronautics Programs were critically important to Lockheed's continued and future operations. Their importance to Lockheed's business is evidenced by Defendants' own repeated statements throughout the Class Period regarding the classified programs. *See* Section V. By that same token, analysts and investors clearly believed the MFC and Aeronautics were critically important, as they pressed the Individual Defendants for more information on the classified programs during earnings calls and conferences and highlighted the programs in their quarterly reporting. For example, during the J.P. Morgan Industrials Conference held on March 13, 2024, when asked questions regarding the classified programs, Defendant Malave described them both as "growth engine[s]," meaning both programs were viewed as long-term, core revenue drivers for the Company. Moreover, investors' swift reaction to the losses in the MFC and Aeronautics Programs further confirms that the market viewed those programs as critical to Lockheed's financial viability. *See* Section VI.

238. Given the scale, revenue concentration, and strategic importance of the MFC, Aeronautics, and F-35 Programs, it is implausible that the Individual Defendants—who served as Lockheed's most senior executives and were responsible for certifying the accuracy of the Company's SEC filings—were unaware of the adverse facts concealed or misrepresented during the Class Period. Unlike allegations involving peripheral business lines, the facts here concern a

program that Defendants themselves repeatedly described as central to the Company's operations and financial performance.

239.    Accordingly, when viewed holistically, the allegations give rise to a strong inference that the Individual Defendants were aware of the issues alleged related to the MFC, Aeronautics, and F-35 Programs.

**E.    Corroborative FE Accounts Provide Further Inference of Scienter**

240.    The corroborated accounts of multiple former employees support a strong inference of scienter. Where, as here, numerous former employees independently describe the same operational failures, fixed-price risk, and internal concerns, those allegations reasonably support the inference that the issues were systemic, known at the company-wide level, and therefore either known to, or recklessly disregarded by, senior management, whose knowledge may be imputed for purposes of the securities laws.

241.    FE accounts establish that the MFC Program had cost concerns and execution issues from its inception prior to, and throughout the Class Period, that Lockheed failed to appropriately mitigate these risks. As a result, FE accounts confirm losses on the program were considered likely prior to April 2024.

242.    For example, FE-1 recalled that at the time she joined the program in 2019, there were already discussions about implementing redesigns to lower the per unit cost to mitigate the possible costs. FE-1 recalled a "poor business decision" that was made in 2021 by the VP responsible for the program at that time. FE-1 explained that she had made the decision to not pursue design changes when they would have been "most helpful." FE-1 recalled bringing design changes to this VP and being told to "put them on the shelf." FE-1 further recalled that these design changes were later "picked up" but at that point it was too late to fully implement them.

243.    FE-1 recalled that it was a "known likelihood" losses would occur "many months" prior to the April 2024 announcement. According to FE-1, the Company had "run out of time" to implement design changes and the process of changing qualifications on a contract takes time and is "extremely expensive."

244.    FE accounts also establish that there were routine meetings discussing issues with Lockheed's classified programs, as well as comprehensive internal reporting and monitoring, meaning information regarding fixed-price risk and execution challenges was known and widely disseminated throughout the Company.

245.    According to FE-1, in her final role at the Company, she was provided status updates on the MFC program in meetings with senior leadership. FE-1 recalled that the regularity of these meetings had decreased to now only occurring approximately monthly.

246.    FE-2 recalled that if a contract was expected to be a loss, it was presented to management. They would discuss how they wanted to "manipulate or massage the numbers." In her opinion, Lockheed tried to make it look like they had everything under control and would "sweep things under the rug."

## F.    Defendants Taiclet and Malave Were Financially Motivated to Commit Securities Fraud

247.    Defendants Taiclet and Malave were financially motivated to withhold or delay disclosure of materially adverse information from the investing public because a substantial portion of their compensation was equity-based and directly tied to Lockheed's stock price and shareholder return. This compensation structure provided the Individual Defendants with a personal and concrete economic incentive to maintain an artificially inflated share price during the Class Period.

248.    At all relevant times, Lockheed maintained a pay-for-performance executive compensation program applicable to its senior leadership, including Defendants Taiclet and Malave. Under this program, senior executives received compensation comprised of: (i) base salary, (ii) annual cash incentive compensation, and (iii) long-term equity-based compensation, including restricted stock units ("RSUs") and performance stock units ("PSUs"), the value of which was directly dependent on Lockheed's stock price and financial performance.

249.    Lockheed's PSUs were subject to multi-year performance conditions, further amplifying executives' exposure to sustained stock price declines. For the 2024–2026 PSU performance cycle, 50% of PSU awards were tied to relative total shareholder return ("TSR"), 25% to free cash flow, and 25% to return on invested capital ("ROIC"). The performance period for these awards extended through December 31, 2026, meaning that adverse disclosures affecting stock price, cash flow, or capital efficiency during the Class Period directly threatened Defendants' ability to earn and retain these awards.

250.    For fiscal year 2024, Defendant Taiclet received total compensation of approximately $23,753,914, of which approximately $13,046,594—more than 55%—consisted of stock awards. Defendant Malave received total compensation of approximately $8,532,614, of which approximately $4,269,880—approximately 50%—consisted of stock awards. Thus, a majority of each of the Individual Defendant's compensation depended on maintaining Lockheed's stock price and financial metrics.

251.    Because the PSUs and RSUs are directly impacted by stock price declines, senior executives can be incentivized to delay the disclosure of negative information either knowingly or with severe recklessness. Such disclosure violation is undertaken as a means to avoid the triggering

of an immediate stock drop in the hope that later good news, remediation, or offsetting performance will prevent or blunt the impact of the eventual disclosure.

252.    FE accounts corroborate that contracts were entered into to boost bonuses. For example, in FE-2's opinion, contract proposals were never accurate, and certain contracts were negotiated improperly. She suggested that they were thrown together quickly to "help the financial numbers" and that there was no due diligence done to ensure that the company could successfully complete the contract. FE-2 went on to suggest that contracts were taken in order to inflate numbers and to boost bonuses. FE-2 explained that many of the contracts ended up being over cost and behind schedule.

253.    Accordingly, Defendants Taiclet and Malave were incentivized to delay the disclosure of negative information either knowingly or with severe recklessness, in order to mislead the market and artificially inflate Lockheed's stock price. When considered together with Individual Defendants' access to internal information, their hands-on involvement in core operations, and the timing and content of the Company's disclosures, these compensation-based incentives further support a strong inference of scienter.

## VIII.    CLASS ACTION ALLEGATIONS

254.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Lockheed during the period from January 23, 2024 through July 21, 2025, inclusive. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who are individuals; (iii) any person who was an officer, director or control person of Lockheed during the Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Lockheed's employee retirement and benefit

plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

255.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lockheed's shares actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Lockheed shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Lockheed or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

256.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

257.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

258.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Lockheed;

(c)    Whether, and to what extent, the market price of Lockheed common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d)    Whether Defendants acted with the requisite level of scienter;

(e)    Whether Defendants Taiclet and Malave were controlling persons of Lockheed; and

(f)    Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

259.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

260.    To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    Lockheed common stock traded in an efficient market;

(d)    The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Lockheed common stock; and

(e)    Lead Plaintiffs and other members of the Class purchased Lockheed common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

(f)    Lockheed common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g)    According to the Company's SEC Form 10-K filed on January 28, 2025, the Company had approximately 235 million shares of common stock outstanding as of the date of the filing, demonstrating a very active and broad market for Lockheed common stock;

(h)    Lockheed filed periodic public reports with the SEC;

(i)    Lockheed regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures;

(j)    Lockheed was followed by several securities analysts employed by major brokerage firms including J.P. Morgan, Morgan Stanley, UBS, and several others, which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms, were publicly available, and entered the public marketplace;

(k)    Unexpected material news about Lockheed was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

(l)    There were market makers for Lockheed's shares during the Class Period.

261.    As a result of the foregoing, the market for Lockheed common stock promptly digested current information regarding Lockheed from publicly available sources and reflected such information in Lockheed's share price. Under these circumstances, all persons and entities who purchased or otherwise acquired Lockheed common stock during the Class Period suffered similar injuries through their purchases of Lockheed common stock at artificially inflated prices and the presumption of reliance applies.

262.    The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Lockheed common stock.

263.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of Lockheed common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

264.    To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Lockheed's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

265.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

266.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants spoke with knowledge of existing adverse facts and conditions—including cost overruns, fixed-price risks, and the award for Lot 18 and 19, among other things—rendering their statements misleading when made and stripping them of any protection under the PSLRA's safe harbor.

267.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Lockheed who knew that the statement was false when made.

## XI.    CONTROL PERSON ALLEGATIONS

268.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

269.    The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to Lockheed during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

270.    The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Lockheed's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings thereof, and reports and other information provided to them in connection therewith.

271.    As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Lockheed's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of Lockheed common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

272.    The Individual Defendants are liable as primary participants in a fraudulent scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired Lockheed common stock during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) regarding Lockheed's pricing and cost-control mechanisms, ongoing cost overruns, and the risk of losses in Lockheed's MFC, Aeronautics, and F-35 Programs.

273.    The scheme: (i) deceived the investing public regarding Lockheed's operations and the true value of Lockheed common stock, and (ii) caused Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Lockheed common stock at artificially inflated prices.

274.    In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Lockheed, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## XII.    CAUSES OF ACTION

### COUNT I

### For Violation of §10(b) of the Exchange Act
### and Rule 10b-5 against Defendants

275.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

276.    The Count is asserted on behalf of all members of the Class against Defendants Lockheed, Taiclet, and Malave, for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

277.    As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiffs and the Class; (ii) artificially manipulate the price of Lockheed common stock; and (iii) cause Lead Plaintiffs and members of the Class to purchase Lockheed common stock at artificially inflated prices.

278.    The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged here in and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

279.    As set forth above, Defendants made their false and misleading statements omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who purchased Lockheed common stock during the Class Period.

280.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Lockheed common stock, Lead Plaintiffs and other members of the Class purchased

Lockheed common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiffs and members of the Class would not have purchased Lockheed common stock at such artificially inflated price. As set forth herein, when the true facts were subsequently disclosed, the price of Lockheed common stock declined precipitously, and Lead Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Lockheed common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

281.    By virtue of the foregoing, Defendants are liable to Lead Plaintiffs and members of the Class for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### against the Individual Defendants

282.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

283.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violation of § 20(a) of the Exchange Act.

284.    The Individual Defendants had control over Lockheed and made the materially false and misleading statements and omissions on behalf of Lockheed within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead

Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

285.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Lockheed, in turn, controlled the Individual Defendants and all of its employees.

286.    By reason of such wrongful conduct, Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action, and certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel for the Class;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS

Lead Plaintiffs demand a trial by jury.

DATED: January 12, 2026     Respectfully submitted,

             */s/ Michael P. Canty*
             **LABATON KELLER SUCHAROW LLP**
             Michael P. Canty
             James T. Christie
             Nicholas D. Manningham
             140 Broadway
             New York, New York 10005
             Telephone: (212) 907-0700
             Facsimile: (212) 818-0477
             mcanty@labaton.com
             jchristie@labaton.com
             nmanningham@labaton.com

             *Counsel for Lead Plaintiffs*