**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MUHAMMAD KHAN, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>     vs.<br><br>LOCKHEED MARTIN CORPORATION, JAMES D. TAICLET, and JESUS MALAVE,<br><br>                           Defendants. | No. 1:25-cv-06197-MMG<br><br>Judge Margaret M. Garnett<br><br>CLASS ACTION |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

I.      INTRODUCTION ........................................................................................................... 1

II.     FACTUAL BACKGROUND ......................................................................................... 6

        A.      Company Background ........................................................................................ 6

        B.      Defendants Falsely Stated They Managed the Risk of Cost Overruns For Their Fixed Cost Programs ......................................................................................... 7

        C.      Defendants Misled Investors About the MFC Program ...................................... 7

        D.      Defendants Misled Investors About the Aeronautics Program ............................ 8

        E.      Defendants Misled Investors About the F-35 Program ....................................... 8

        F.      Lockheed Shocked Investors by Disclosing Losses in the MFC and Aeronautics Programs .......................................................................................... 9

        G.      Lockheed Shocked Investors Again by Disclosing Another $1 Billion Loss ......... 9

III.    LEAD PLAINTIFFS HAVE ADEQUATELY STATED A SECTION 10(B) CLAIM .... 9

        A.      The Complaint Adequately Alleges Falsity ........................................................ 10

                1.      Defendants Misled Investors About Lockheed's Cost Analysis and Risk Management Procedures ......................................................................... 10

                2.      Defendants Misled Investors About Three of Lockheed's Most Important Programs ................................................................................ 13

                        a.      Defendants Misled Investors About the MFC Program ............... 13

                                (1)     Defendants' False and Misleading Statements ................ 13

                                (2)     Defendants' Falsity Arguments Fail ................................ 16

                        b.      Defendants Misled Investors About the Aeronautics Program ..... 19

                        c.      Defendants Misled Investors About the F-35 Program ................ 22

        B.      The Complaint Adequately Alleges Scienter ...................................................... 24

                1.      Former Employee (FE) Accounts Support an Inference of Scienter ........ 24

                2.      Defendants' Admissions Support an Inference of Scienter ...................... 25

3.     Defendants' Own Statements Demonstrate Knowledge............................ 25

4.     Motive and Opportunity................................................................. 27

5.     Malave's Departure..................................................................... 28

6.     Core Operations Doctrine ............................................................ 28

7.     The More Compelling Inference is Fraudulent........................................ 29

C.     The Complaint Adequately Alleges Control Person Claims ................................ 29

IV.    CONCLUSION.................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alstom SA Sec. Litig.*,
　406 F. Supp. 2d 433 (S.D.N.Y. 2005).......................................................................................24

*In re AppHarvest Sec. Litig.*,
　684 F. Supp. 3d 201 (S.D.N.Y. 2023).......................................................................................12

*In re Avon Sec. Litig.*,
　2019 WL 6115349 (S.D.N.Y. 2019)....................................................................................25, 28

*In re Block, Inc. Sec. Litig.*,
　2025 WL 2607890 (S.D.N.Y. 2025).........................................................................................27

*In re Dentsply Sirona, Inc. Sec. Litig.*,
　665 F. Supp. 3d 255 (E.D.N.Y. 2023) .....................................................................................19

*Diabat v. Credit Suisse Grp. AG*,
　2024 WL 4252502 (S.D.N.Y. 2024)........................................................................................20

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
　553 F.3d 187 (2d Cir. 2009).....................................................................................................22

*Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*,
　794 F.3d 297 (2d Cir. 2015)..................................................................................................9, 24

*In re Estee Lauder Co., Inc. Sec. Litig.*,
　2025 WL 965686 (S.D.N.Y. 2025)..........................................................................................26

*Freedman v. Value Health, Inc.*,
　958 F. Supp. 745 (D. Conn. 1997)......................................................................................12, 25

*Freudenberg v. E*Trade Fin. Corp.*,
　712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................................12

*Gimpel v. Hain Celestial Grp., Inc.*,
　156 F.4th 121 (2d Cir. 2025) .......................................................................................16, 18, 27

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
　236 F. Supp. 3d 824 (S.D.N.Y. 2017)......................................................................................23

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
　818 F.3d 85 (2d Cir. 2016)........................................................................................................12

*Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)................................................................................10

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..............................................................................................10

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 241 (2d Cir. 2014)...........................................................................16, 18

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)...........................................................13, 19

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020).........................................................14, 15

*Mulligan v. Impax Lab'ys, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................................24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015).............................................................................................18

*In re Pareteum Sec. Litig.*,
    2021 WL 3540779 (S.D.N.Y. 2021)....................................................................28

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005).................................................................29

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)................................................................................23

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. 2016)..............................................................17, 23

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
    732 F. Supp. 3d 300 (S.D.N.Y. 2024).................................................................27

*Schnall v. Annuity & Life Re (Holdings), Ltd.*,
    2004 WL 367644 (D. Conn. 2004) ......................................................................14

*SEC v. Medallion Fin. Corp.*,
    2024 WL 4227753 (S.D.N.Y. 2024).....................................................................18

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. 2018).....................................................................12

iv

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
    2024 WL 456745 (S.D.N.Y. 2024) .................................................................................21

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021) ............................................................................................9

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) .......................................................................................................24

*In re Vale S.A. Sec. Litig.*,
    2020 WL 2610979 (E.D.N.Y. 2020) ...............................................................................17

*In re Virtu Fin., Inc. Sec. Litig.*,
    770 F. Supp. 3d 482 (E.D.N.Y. 2025) ............................................................................27

*In re Vivendi Universal, S.A.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ............................................................................14

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .....................................................................................10, 21

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020) ............................................................................21

*Wilson v. LSB Indus. Inc.*,
    2017 WL 7052046 (S.D.N.Y. 2017) .....................................................................17, 18, 22

**Statutes**

PSLRA, § 78u-4 *et seq.*................................................................................................ *passim*

**Rules and Regulations**

Federal Rules of Civil Procedure

   Rule 9(b) .........................................................................................................................9, 10

   Rule 15 ................................................................................................................................29

Lead Plaintiffs Local 705 International Brotherhood of Teamsters Pension Fund and New England Teamsters Pension Fund ("Lead Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants'[1] Motion to Dismiss[2] the Amended Complaint (the "Complaint," ECF No. 52).

## I.     INTRODUCTION

Despite Defendants' attempts to recast what this case is about, it is fundamentally a straightforward and clear case of securities fraud. Lockheed's most senior executives assured investors, quarter after quarter, that they actively monitored Lockheed's important fixed-price contracts and had the risk of losses "well-contained"—even though Defendants knew Lockheed lacked adequate internal systems needed to determine whether that was true.  Ultimately, investors absorbed the losses when Lockheed was finally forced to disclose billions in losses from cost overruns. This action seeks to recover those losses investors suffered due to Defendants' fraud.

As alleged in the Complaint, Defendants actively concealed from investors that: (i) Lockheed did not have adequate cost analysis and risk management procedures in place to manage costs in critical programs; and (ii) as a result, three of Lockheed's most important programs—the MFC Program, the Aeronautics Program, and the F-35 Program—were over cost and would result in losses that would materially harm Lockheed's profitability. Investors knew none of this. Instead, Defendants repeatedly made materially false statements touting Lockheed's ability to manage

---

[1] Defendants are Lockheed Martin Corporation, ("Lockheed" or the "Company"), James Taiclet ("Taiclet"), and Jesus Malave ("Malave," and collectively with Lockheed and Taiclet, "Defendants").

[2] "Motion" refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint (ECF No. 55). Citations to "Ex." refer to the exhibits attached to the Declaration of Kristina A. Bunting (ECF No. 56). Citations to "¶" or "¶¶" refer to paragraphs in the Complaint. Unless otherwise noted, all emphasis has been added and internal quotation marks omitted.

costs and downplaying the risks of cost overruns when, in reality, the three programs were all suffering substantial undisclosed losses.

For example, on January 23, 2024, Defendant Malave downplayed cost overrun risks by claiming "*we're [] keeping a tight lid on . . . costs*" and that Lockheed was "*not aware of any other contracts that . . . would cause any material issues*." ¶¶156, 160. This was false. Unbeknownst to investors, Lockheed lacked adequate cost analysis and risk management processes—deficiencies that Defendants later conceded (only after billions in losses came to light). ¶¶153-55, 157-59, 161-62. But instead of revealing those known deficiencies and warning investors that the MFC and Aeronautics Programs were already experiencing cost overruns that made substantial losses inevitable, Defendants repeatedly touted their "*pricing discipline*" and risk-adjusted bidding practices (¶¶150-51), thereby falsely reassuring investors about the Company's cost and risk management procedures while concealing the immediate threat of losses from the MFC and Aeronautics Programs.

The MFC Program was of particular concern to investors at the start of the Class Period. At that point, the program had just switched from a cost-reimbursable contract (meaning Lockheed would get reimbursed for excess costs) to a fixed-price contract—meaning there was a greater risk of cost overruns that Lockheed would be forced to absorb. Despite this new phase of the contract, Defendants downplayed the cost risks to investors. During the Class Period, Defendants publicly stated Lockheed would record a $325 million loss in 2024 and assured investors the remaining losses from the contract, if any, would be spread out in 2025 and beyond under "*a one-per-year type of framework*." *See, e.g.,* ¶¶167-68. Then, on December 3, 2024, Defendant Malave told investors the MFC losses would actually be **lower** moving forward and described the MFC Program as a "*tailwind*." ¶172. However, Defendants had no reasonable basis to make those

2

statements, as they were fully aware they had inadequate control over costs and risks in that program and that they were about to record a staggering $1.3 billion loss on the program. Just a few weeks later, investors were shocked when Lockheed abruptly disclosed that it had to record a $1.3 billion loss in 2024—nearly **a billion dollars more** than Defendants stated just weeks earlier. *See, e.g.*, ¶¶128, 199.

Similarly, Defendants misled investors about their ability to control costs and mitigate risks in the Aeronautics Program. Specifically, after abruptly recording massive losses in October 2024 and January 2025, which took investors by surprise because Defendants knowingly concealed such risks (*see, e.g.*, ¶¶128, 200), Defendants tried to calm investor concern by falsely stating they had "***significantly reduced the risk of future charges***" to the Aeronautics Program and falsely reassuring investors they had the cost overrun issue "***well-contained***." ¶¶179, 183. Those were lies. Just a few months later on July 22, 2025, after the CFO abruptly resigned, Lockheed disclosed **another $1 billion loss** in the Aeronautics Program and finally admitted that Lockheed needed to implement sweeping remedial measures to its cost analysis and risk management procedures— conceding that the supposed cost control measures that Defendants touted during the Class Period were actually known to be inadequate. ¶¶138-42.

At the same time, Defendants misled investors about the F-35 Program. Defendants knew that a mandatory software upgrade for the F-35, known as the TR-3 upgrade, was plagued by implementation and cost failures that caused aircraft delivery delays of more than 200 days, drove total F-35 Program costs up by nearly $43 billion in a single year, and strained the Company's relationship with the U.S. government to the point that negotiations over the next production contract—valued at $24.3 billion—had stalled. ¶¶109-11, 235. Despite these known problems, Defendant Malave falsely told investors on July 23, 2024 that Lockheed "***expect[ed]***" the new F-

35 contract "*to be awarded this year, maintaining program funding, and continuity*," ¶163, conveying a misleadingly positive picture of a program that was mired in excess costs and contract uncertainty. *Id*. On October 22, 2024, Lockheed was forced to disclose that the next contract would not be awarded in 2024—contrary to Defendants' previous statements—and the Company could not recognize revenue or profit on approximately $400 million in incurred costs—revelations that contributed to a 6% single-day stock decline. ¶¶115-16.

Defendants' Motion to Dismiss does not meaningfully address any of these allegations. Instead, their Motion creates a counter-factual narrative to support their arguments. For example, Defendants argue the alleged misstatements are not actionably false or misleading because Lockheed generally warned investors of the risks of losses. *See* Motion at 1, 17. This misses the point. Investors understood that Lockheed develops technologies on fixed-price contracts and therefore might suffer losses when projected costs exceed the contract value. However, investors did **not** know—because Defendants never warned them—that Lockheed did not have adequate cost analysis and risk management procedures in place at all, which led to ballooning costs and a failure to fulfill contractual obligations that caused higher than expected losses. Moreover, although Defendants made generic statements that the MFC and Aeronautics Programs **might** suffer losses, such generic warnings were not specific enough to counteract Defendants' false statements to the contrary which affirmatively dispelled the possibility of such risks in real time.

Indeed, central to Defendants' entire argument is their contention that investors were aware of the risks. But if Defendants had adequately disclosed the risks, as they now argue, why were investors completely blindsided by the Company's disclosures of losses?  The answer is simple: because Defendants' repeated false statements reassured investors that Lockheed had costs under control.  For example, after disclosing the nearly $2 billion in losses on January 28, 2025—which

4

caused a 10% single-day stock price decline, *see* ¶126-29—Defendants falsely reassured investors that they had the cost issues "***well contained***" and that they had "***de-risked***" the Aeronautics Program. ¶¶177, 183. However, just a few weeks later, on July 22, 2025, Lockheed was forced to take **another $1 billion loss** from the Aeronautics Program, forcing Defendants to finally admit they needed new reforms to Lockheed's deficient cost and risk procedures, and causing Lockheed's stock price to drop another 10% in a single day. ¶¶138, 148. In response, one analyst from Wolfe Research asked, "why should investors feel at all comfortable that you've de-risked the problem programs" now? ¶145. Another analyst from Bank of America asked, "why did it take $1 billion charges to change the way you're reviewing this thing?" *Id.* Such analyst reports plainly belie Defendants' argument that investors knew of the risks.

Defendants also present several other falsity arguments that fail. For example, Defendants argue their false statements about the Aeronautics Program are forward-looking statements protected by the PSLRA safe harbor. Motion at 15. However, the safe harbor does not apply to Defendants' statements—such as Malave's false statement that Lockheed has already "***de-risked***" the program and had cost risks already "***well-contained***," ¶¶179, 183—because they omitted material facts and discussed actions that had already ostensibly occurred. Defendants also argue that some of their statements are inactionable puffery. For example, Defendants claim Malave's "***de-risked***" statement is puffery, essentially arguing investors did not care whether Lockheed had reduced the risk of future charges in the program. This is absurd, given the importance of the programs, and belied by both investors' pointed questions about the risk of losses and the furious reaction from analysts after the truth was revealed, who questioned why the market should trust that Lockheed had "**de-risked** the problem programs." ¶145. Defendants' framing of Lockheed's

5

statements as opinions similarly fails; their statements are largely factual, and even if opinions, they remain actionable because they lacked a reasonable basis.

Defendants' challenges to scienter also fail. For example, Defendants argue the Complaint does not adequately allege scienter because the statements from former Lockheed employees (identified as FEs) are "untethered to the alleged fraud." Motion at 2-3. Not so. The FEs paint a consistent picture of a company that lacked the controls necessary to price, monitor, and manage its most important fixed-price contracts. For example, FE-1, a Senior Project Manager on the MFC Program, stated that cost overruns were known for many months before Defendants disclosed any losses. ¶106. Similarly, FE-1 said there were already discussions about lowering costs in the MFC Program in 2019, and FE-3 explained there was uncertainty regarding the MFC Program's financial viability as early as 2020. ¶¶107-08. These FE allegations—paired with other allegations, such as Defendant Malave's statement that they "closely" monitored the programs (¶160)— support a strong inference of scienter.

The Court should deny Defendants' Motion in its entirety.

## II.     FACTUAL BACKGROUND

### A.     Company Background

Lockheed is a defense contractor that generates most of its revenue from long-term contracts with the U.S. Department of Defense and allied governments. ¶¶72, 74. Many of these contracts, including the MFC and Aeronautics Programs, are fixed-price arrangements under which the contractor (Lockheed) bears the risk of cost overruns that directly reduce profitability. ¶76. As a result, investors closely scrutinized Lockheed's ability to manage costs in the MFC and Aeronautics Programs as a critical factor in assessing the Company's profitability. ¶¶10, 78, 83.

**B.    Defendants Falsely Stated They Managed the Risk of Cost Overruns For Their Fixed Cost Programs**

Lockheed's ability to manage costs and limit the risks of cost overruns is vital to Lockheed and its investors. However, FEs recounted that Lockheed lacked sufficient procedures to assess, manage, and mitigate cost issues. These issues were known as early as 2019, ¶¶101, 108, and it became clear by the start of the Class Period that Lockheed was unable to track or mitigate losses from these programs. ¶101.

Despite knowing that Lockheed's inability to manage risks and costs was creating an overhang on Lockheed's profitability, Defendants repeatedly assured investors that risks were well contained and that robust cost-management procedures were in place. ¶¶12, 94-96, 150. For example, on January 23, 2024, Defendant Malave touted the Company's "***pricing discipline***" and claimed that Lockheed's "***pricing accounts for [] risk***," including cost risks associated with fixed-price contracts. ¶150. When analysts specifically pressed Defendants about the MFC Program's impact on margins, Defendant Malave downplayed the risks, stating the Company was "***keeping a tight lid on overhead and indirect costs***." ¶156. These statements, however, were false: the Company lacked the procedures necessary to manage rising costs, and FEs confirmed that the deficiencies with Lockheed's procedures had been known internally since well before the Class Period. ¶¶99, 101, 106-07, 153, 157.

**C.    Defendants Misled Investors About the MFC Program**

The MFC Program originally operated as a cost-reimbursement contract, but in or around 2024, it switched to a fixed-price contract. ¶87. On April 23, 2024, Defendants disclosed a $100 million reach-forward loss on the MFC Program—the first such disclosure—and guided investors that total 2024 MFC losses would be approximately $325 million. ¶¶22, 105.

7

Starting in Fall 2024, Defendants repeatedly told investors that the losses on the MFC Program would not exceed $325 million. On October 22, 2024, Defendant Malave falsely reiterated that full-year MFC losses would be limited to approximately $325 million. ¶¶34, 120-21, 167-68. On December 3, 2024—weeks before year-end—Malave described the MFC Program as a "*tailwind*," assuring investors that losses were diminishing and the program was transitioning to profitability. ¶¶35, 122, 172.

### D.    Defendants Misled Investors About the Aeronautics Program

Another significant program was Lockheed's Aeronautics Program, another fixed-price contract. After Lockheed announced massive unexpected charges for the MFC and Aeronautics Programs in January 2025, Defendant Taiclet doubled down, claiming these massive charges had "*derisk[ed]*" Lockheed's "*financial profile*[.]" ¶¶130, 177. Similarly, on February 13, 2025, Defendant Malave stated that the remaining cost overrun problems were "*well-contained*." ¶¶132, 183. These statements calmed investor concerns. But unfortunately for investors, they were false: Lockheed did not have the cost overrun problems contained, and would soon declare an additional $1 billion loss in the Aeronautics Program. ¶¶49, 134, 180-82.

### E.    Defendants Misled Investors About the F-35 Program

Lockheed develops and manufactures F-35 aircrafts for the U.S. military. ¶89. The F-35 Program, which accounts for roughly a quarter of Lockheed's revenue, involves contracts with the U.S. government. ¶¶89-90. Throughout the Class Period, the F-35 Program experienced significant difficulties implementing a mandatory technology upgrade known as TR-3, resulting in material cost pressures and delivery delays. ¶¶26, 110-11. These failures delayed the award of the next production contract (Lots 18-19). ¶¶26, 111. Yet on July 23, 2024, Defendant Malave told investors that Lockheed "*expect[ed] F-35 Lot 18 and 19 to be awarded this year, maintaining program funding, and continuity*"—a statement that was false and misleading when made. ¶¶112,

163. On October 22, 2024, Lockheed disclosed that Lots 18-19 contract negotiations were indefinitely stalled due to excess costs, preventing the Company from recognizing approximately $400 million in revenue. ¶¶30, 32, 115-19, 191, 194.

### F. Lockheed Shocked Investors by Disclosing Losses in the MFC and Aeronautics Programs

Shortly after telling investors MFC Program losses would be $325 million, Defendants disclosed on January 28, 2025, that actual yearly MFC Program losses were $1.3 billion, and that the Aeronautics Program had also suffered an additional $410 million in losses. ¶¶39, 126, 197-98. Analysts were completely blindsided by this disclosure. Morgan Stanley noted the losses "took investors by surprise," and Deutsche Bank reported that the Aeronautics charge had not been "previewed." ¶¶41-42, 128, 199-200. As a result, Lockheed's stock price fell over 9% in a single day. ¶¶43, 129, 201.

### G. Lockheed Shocked Investors Again by Disclosing Another $1 Billion Loss

On July 22, 2025, Lockheed disclosed an additional $950 million loss on the Aeronautics Program and admitted that a "comprehensive review" had revealed the need for "significant updates to the program's schedule and cost estimates," as well as enhancements "across the portfolio"—an acknowledgment that the Company's cost controls had been inadequate. ¶¶51-52, 138-40, 204-05, 212. Lockheed's stock plummeted more than 10% in one day. ¶¶148, 209.

## III. LEAD PLAINTIFFS HAVE ADEQUATELY STATED A SECTION 10(B) CLAIM

On a motion to dismiss, a court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). Securities fraud claims under §10(b) are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA, however, courts "must be careful not to mistake heightened pleading standards for impossible ones." *In re Synchrony Fin. Sec. Litig.*,

9

988 F.3d 157, 161 (2d Cir. 2021). An "alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities." *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original).

To state a claim for securities fraud under §10(b) of the Exchange Act and SEC Rule 10b-5(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [*i.e.*, falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Here, Lead Plaintiffs have established both falsity and scienter—the only elements challenged by Defendants in their Motion.

### A.    The Complaint Adequately Alleges Falsity

A complaint pleads falsity under Rule 9(b) and the PSLRA if the plaintiff "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). "The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (emphasis in original).

### 1.    Defendants Misled Investors About Lockheed's Cost Analysis and Risk Management Procedures

Lockheed's value to investors is almost entirely dependent on its ability to generate a profit on its contracts—and that ability is almost entirely dependent on Lockheed's ability to manage costs and risks from its contracts, especially fixed-price ones. Accordingly, investors repeatedly asked Defendants about the risk of losses from fixed-price contracts in the MFC and Aeronautics

Programs. In responses to analyst questioning, Defendants repeatedly represented that Lockheed was closely tracking, monitoring, and containing the cost risks in those programs (¶¶150, 156, 160). For example, during Lockheed's Q4 2024 earnings call, Defendant Malave claimed, in response to an analyst question about risks in the MFC Program, that Lockheed was "*employing a lot more pricing discipline*" and was "*keeping a tight lid on overhead and indirect costs.*" *Id*. Similarly, on February 14, 2024, when asked about the Aeronautics Program, Malave claimed that Defendants "*monitor that one pretty closely*" and falsely assured investors that Lockheed was "*not aware of any other contracts that . . . would cause any material issues*." ¶160.

These statements were false. In truth, as multiple FEs (and Lockheed itself) confirmed, Lockheed's cost assessment and risk management procedures were inadequate throughout the Class Period, and the programs were significantly over expected costs. For example, according to FE-2, cost and performance issues were prevalent at Lockheed, explaining that contract proposals were never accurate and many ended up being over cost and behind schedule. ¶81. Similarly, FE-3 stated there were concerns about the MFC Program's financial viability as early as 2020. ¶108. FE-1 likewise explained there were already discussions as early as 2019 about trying to lower costs in the MFC Program, and it was known that losses would occur in the MFC Program prior to the April 2024 announcement. ¶¶101, 106.

Defendants argue their statements were not false because they never said "that [Lockheed's] controls were adequate" or that Lockheed was monitoring its programs successfully. Motion at 10, 23. This argument defies logic. Defendants were responding to analysts' questions about cost risks specifically in the MFC and Aeronautics Programs. By touting Lockheed's purported "pricing discipline" in response to these specific questions, Defendants falsely assured investors that Lockheed's supposed cost and risk management procedures were working as

11

intended for these programs. But their processes were not able to control costs and risks, making Lockheed's statements to the contrary actionably false and misleading. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 264-65 (S.D.N.Y. 2023) (misleading to convey there were no problems with operations when company's operations were deficient).

Defendants also argue that Defendant Taiclet's post-class period admission that Lockheed's cost processes needed improvement does not support an inference they were deficient during the Class Period. Motion at 11, 23. But this ignores the context behind Taiclet's announcement. Specifically, Taiclet made that admission after more than two billion dollars in cost overruns in the MFC and Aeronautics Programs, explaining those overruns led to a "review" that resulted in "significant changes" to the Company's processes. ¶212. Defendant Taiclet was not just saying that Lockheed would improve in the future, he acknowledged that Lockheed failed to monitor costs during the Class Period. Such admissions plainly support falsity. *See, e.g., Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 183-84 (S.D.N.Y. 2010) (post-Class Period admission used to establish falsity); *Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 748-49 (D. Conn. 1997) (claiming a company conducted due diligence were false based on later statement by CEO describing "shortcomings" in due diligence process).

Contrary to Defendants' arguments (Motion at 23-24), these statements are not puffery because they were made in response to specific analyst questions regarding a key point of investor concern. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at \*12 (S.D.N.Y. 2018) (not puffery when statement made in response to questioning about area of investor concern); *see also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir. 2016) (puffery depends on context); ¶¶149, 156, 160. Similarly, Defendants claim that Malave's statement that there was a "possibility that a risk can surface" was forward looking and protected by the PSLRA safe harbor. Motion at

11-13. But the PSLRA safe harbor does not apply here: merely warning of "possible risks while failing to disclose [the] critical facts" that Lockheed's processes were inadequate takes these statements outside the safe harbor. *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013).

### 2. Defendants Misled Investors About Three of Lockheed's Most Important Programs

Throughout the Class Period, Defendants also misrepresented Lockheed's ability to control costs and the risk of losses from three important contracts: the MFC Program, the Aeronautics Program, and the F-35 Program.

### a. Defendants Misled Investors About the MFC Program

Throughout 2024, Defendants repeatedly represented to investors that Lockheed was tracking the costs of the MFC Program (¶¶156, 160), and based on that review, the MFC Program would lose only $325 million in 2024 (¶¶167-68) and the remaining **potential** losses would be spread out in future years (¶172). In truth, however, Lockheed had no reasonable basis to make these statements, as the Company could not manage Lockheed's performance as the program moved into its fixed-price portion.

### (1) Defendants' False and Misleading Statements

On October 22, 2024, Defendant Malave claimed that Lockheed would have to take a charge of "***about $225 million***" in addition to the $100 million charge Lockheed took earlier in 2024—totaling a $325 million loss in 2024. ¶167. Malave further assured investors that any remaining charges in the MFC Program would be recorded in future years, stating that "as far as 2025," charges would be "***between, say, $250 million to $300 million in losses***" for that year under a "***one-per-year type of framework***." ¶168. Weeks later, on December 3, 2024—*i.e.*, the end of the fiscal year—Malave went a step further, telling investors they should expect Lockheed to "***get***

*a benefit from lower losses from the MFC classified program*," which would give Lockheed "*a little bit [of a] tailwind*" in 2025.  ¶172.

Malave's statements were misleading because they led investors to believe Lockheed had reliably assessed the costs and potential risks of cost overruns from the MFC Program and determined that: no additional charges would be taken in 2024; additional losses would be spread out under a one-per-year framework; and investors should expect **lower** losses from the MFC Program moving forward. However, due to Lockheed's inadequate procedures, Defendants had no basis to state additional costs would not be recognized in 2024 or claim the program would be a tailwind. ¶¶101-03, 138-43. Thus, Defendants' statements were actionably false and misleading. *See Schnall v. Annuity & Life Re (Holdings), Ltd.*, 2004 WL 367644, at *7 (D. Conn. 2004) (statements about likelihood of write-offs false and misleading when defendant did not have reasonable basis to make statement); *see also In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 208 (S.D.N.Y. 2020) (when discussing company's value, "Defendants impliedly warranted that" their statements were based on "an accurate reference point").

As FEs explained, Lockheed lacked any basis to accurately measure the costs or the risks embedded in its MFC Program, meaning Lockheed had no ability to accurately assess the probability it would recognize cost overruns as the MFC Program shifted to a fixed-price contract. *See supra* Section III(A)(1). Moreover, the sheer magnitude of the $1.3 billion charge Lockheed announced mere weeks after the above statements further supports an inference of falsity. It defies belief that a company as sophisticated as Lockheed suddenly discovered that it needed to take an additional **billion** dollar charge mere weeks after reassuring investors that a charge would be limited to $325 million and the program would present a "tailwind" for the Company. *See In re*

14

*Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 177 (S.D.N.Y. 2003) (size of impairment supported "reasonable inference" of falsity).

Particularly notable is Defendant Malave's December 3, 2024 statement—made days before the end of the year—claiming that the MFC Program would be a "***tailwind***" to Lockheed's profitability moving forward. In addition to the reasons discussed above, this statement was also misleading because it conveyed to investors that the MFC Program would be accretive to Lockheed's profitability, although in reality, Lockheed was about to recognize the full losses. Indeed, mere weeks later, the Company announced a $1.3 billion charge that Lockheed was forced to take in 2024 alone. It was materially false and misleading for Malave to describe the MFC Program as a "***benefit***" and "***tailwind***" to profitability, and fail to warn investors of the imminent charge, when Lockheed was set to record the full $1.3 billion loss that same quarter.

Defendants argue that Malave's statements that the MFC Program would be a tailwind were not false or misleading because he was "referencing the context of 2025" and "[i]ncreased losses in 2024 would indeed make 'lower losses' in future years more likely." Motion at 20. This argument—that Malave's statement was literally true—misses the point. The securities laws are measured not by "literal truth," but whether statements would mislead an investor. *Mindbody*, 489 F. Supp. 3d at 208. Here, Malave's statements did just that. Throughout the year, Defendants conveyed to investors that losses in 2024 would be limited to $325 million and spread out under a one-per-year framework. If it was literally true at the time of Malave's statement that Lockheed's 2025 losses would be lower because of "increased losses" in 2024, then Malave and Lockheed should have told investors that and disclosed **all** those known increased losses in 2024 that would lead to lower losses in 2025. But they did not, which misled investors and caused Lockheed's stock price to unexpectedly plummet when the truth was disclosed.

15

(2)    Defendants' Falsity Arguments Fail

Defendants argue their statements about the MFC Program were not false or misleading because Lockheed disclosed that additional losses "could" be recognized in 2024. Motion at 18, 20. But this argument completely ignores **why** Lockheed's statements misled investors: not because Lockheed failed to disclose that a charge might occur, but because Lockheed's cost and risk management processes were deficient, causing a $1.3 billion loss in 2024. Because Defendants had no reasonable basis to tell investors to expect only a $325 million loss or to express that the MFC contract would be a tailwind, qualifying those statements with general warnings that additional charges could be taken did nothing to warn investors of the actual risk they faced. As the Second Circuit explained, a company cannot warn of "a business's peculiar risk of fire," while omitting "the fact that the [sprinkler system] has been found to be inoperable, without misleading investors." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 241, 251 (2d Cir. 2014). So too here. Defendants cannot reasonably claim investors were warned by statements cautioning Lockheed "could" recognize additional costs, while simultaneously omitting that Lockheed's cost and risk management processes were utterly deficient and led to the full $1.3 billion loss.

Moreover, Defendants' generic warnings did not counteract their highly specific statements that the $1.3 billion loss would be spread out over the entire lifespan of the contract under a "***one-per-year type of framework***." ¶168. Thus, Lockheed's general warnings that it "could" incur additional losses over the contract's lifespan (*see* Motion at 18, Ex. 10 at 24-25) did not sufficiently warn investors of the known risk of the $1.3 billion loss in 2024, which is exactly why investors were blindsided by the $1.3 billion charge. *See, e.g.*, ¶¶128-29. In any event, Defendants' argument—that their generic warnings counteracted their specific statements to the contrary—is a factual dispute not appropriate for a motion to dismiss. *See Gimpel v. Hain Celestial*

16

*Grp., Inc.*, 156 F.4th 121, 142 (2d Cir. 2025) (inappropriate at pleading stage to assess whether generic warnings counterbalanced specific misrepresentations).

Defendants next turn to a blunderbuss of equally inapplicable falsity defenses in their Motion. These too fail.

**Not Protected by Safe Harbor:** Defendants argue their statements in ¶¶167 and 172 are forward-looking statements protected by the PSLRA safe harbor. Motion at 19, 20-21. Not so. The safe harbor protects forward looking statements only if they are accompanied by meaningful cautionary language or are made without actual knowledge of falsity, but the safe harbor does not protect statements premised on present statements of fact or omissions. *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. 2016).

Fundamentally, the safe harbor does not apply to these statements because they involve misstatements and omissions about Lockheed's **then-existing** cost and risk management processes. Defendants knew, and failed to disclose, that these systems were inadequate and could not adequately measure the risk of cost overruns. These types of misstatements and omissions are not covered by the safe harbor. *See, e.g.*, *Wilson v. LSB Indus. Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. 2017) (safe harbor inapplicable when defendants "fail[ed] to disclose that no detailed engineering analysis had been performed to support their cost projections").

Even if the statements were subject to the safe harbor—and they are not—the lack of meaningful cautionary language dooms Defendants' arguments. Cautionary language is not "meaningful" if it is generic or warns of the wrong risk. *See In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *14 (E.D.N.Y. 2020) (warnings that dams could collapse did not warn investors of relevant risks: potential risk management failures). For example, Defendants cite cautionary language warning that Lockheed may recognize additional costs for the MFC Program. Motion at

18. But that language did not warn investors of the relevant risks, namely that Lockheed **already** had deficient performance and cost procedures, and Lockheed's cost and risk management processes admittedly could not accurately measure losses. *Jinkosolar*, 761 F.3d at 251 (risk disclosure that a fire may occur is not meaningful when the relevant risk is that the sprinkler system may not work). Moreover, the statements Defendants argue are forward looking (including ¶¶177-79, 183) were made with actual knowledge of their falsity, further foreclosing the safe harbor. *See infra* Section III(B).

**Not Inactionable Opinions:** Despite Defendants' arguments, the statements in ¶¶166-67 (concerning the MFC Program charges) are not inactionable opinions, as they contained embedded statements of fact that were untrue—specifically, that Defendants had reasonably determined that additional charges were not probable at the time. *See SEC v. Medallion Fin. Corp.*, 2024 WL 4227753, at *7-8 (S.D.N.Y. 2024) (opinions actionable where embedded statements of fact untrue). As was revealed, Defendants' cost assessment processes were deficient at the time, making their statements actionably false and misleading.

Similarly, opinions are actionably misleading if they "do not rest on the inquiry or investigation that a reasonable investor would expect." *LSB*, 2017 WL 7052046, at *1; *see also Hain*, 156 F.4th at 140 n.13 (holding the same). In other words, opinions are actionable if they omit that the speaker lacks a reasonable basis for the opinion. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015*)* (explaining that statement "we believe our conduct is lawful" would be misleading if no "meaningful legal inquiry" into the conduct). Like the example provided in *Omnicare*, Defendants lacked a reasonable basis for statements concerning MFC Program losses given admitted failures of Lockheed's risk and cost management processes.

### b.    Defendants Misled Investors About the Aeronautics Program

Defendants further misled investors about the risk of losses from the Aeronautics Program. After the Company announced a shocking $410 million charge on the Aeronautics Program on January 28, 2025, Defendant Malave falsely reassured investors that the Aeronautics Program had been "*de-risked*" and that Lockheed had "*significantly reduced the risk of future charges*," conveying to the market that Lockheed's risk and cost management processes had effectively mitigated the chances of future charges on the Aeronautics Program. ¶¶177-79. Similarly, two weeks later, Malave claimed Lockheed had future losses in the Aeronautics Program "*well contained*." ¶183. Taken together, these statements conveyed to investors that Lockheed had already taken steps to mitigate the risk of future charges.

But in reality, Lockheed was flying blind. As FEs recounted, Lockheed conducted "no due diligence" on its contracts and regularly ran over cost and behind schedule. *See supra* at 12; *MF*, 982 F. Supp. 2d at 317 (statements that internal processes mitigated risk actionable when internal weaknesses undermined statements). And notably, Defendants themselves admitted at the end of the Class Period that the Company needed to "add[] rigor" to its controls and processes, including increased oversight and more comprehensive review of actual program performance, directly contradicting Malave's statements that they had things under control. ¶¶139-41; *see In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023) ("[s]ubsequent events can lend support to an inference that a statement was fraudulent when made").

Defendants cry foul, claiming that Lead Plaintiffs are alleging "fraud by hindsight" without alleging contemporaneous facts to show the charges should have been taken earlier. Motion at 10-

19

14. Again, this argument misses the mark.[3] Defendants' statements were not misleading because they should have taken a charge earlier. Instead, it was misleading for Defendants to tell investors they had de-risked and contained cost overruns in the Aeronautics Program when they had not done so (as they themselves admitted months later). Defendants cannot meaningfully argue they did not mislead investors by claiming Lockheed had contained cost overruns when they later admitted that Lockheed's purported processes to do so were deficient and forced them to take another $1 billion loss.

Moreover, the Complaint demonstrates through contemporaneous FE allegations that Lockheed's deficient processes were in place throughout the Class Period. *See, e.g.*, ¶¶102, 106. Further, like the MFC Program, the sheer magnitude of the later charges supports an inference of falsity. Defendants took an additional **billion-dollar charge** on the Aeronautics Program at the same time they admitted Lockheed's risk and cost procedures were not up to par. The inevitable conclusion is that contrary to Defendants' statements, those same procedures had not actually "de-risked" the Aeronautics Program at that time.

Defendants next pivot to an attack on both the FEs and Taiclet's own admission at the end of the Class Period, claiming neither evidence falsity. Motion at 11. These arguments fail. First, Defendants claim that because the FEs worked in MFC, not Aeronautics, their statements are irrelevant. *Id*. However, the FEs recounted problems that Defendants admitted were systemic. As courts have explained, FE allegations of this type can "demonstrate the pervasive and systemic nature of [Lockheed's] problems . . . from which the falsity of Defendants' statements . . . may be inferred." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 963 (N.D. Cal. 2014). Second,

---

[3] This case is unlike *Diabat v. Credit Suisse Grp. AG*, 2024 WL 4252502, at *12 (S.D.N.Y. 2024), where plaintiffs alleged no particularized facts that the statements were false when made. Here, both FEs' statements and Defendants' own admissions demonstrate contemporaneous falsity.

Defendants attack Taiclet's admission that Lockheed's risk and cost management processes needed improvement, claiming it doesn't support falsity. Motion at 11. Again, this ignores context. *See Vivendi*, 838 F.3d at 250 (falsity is assessed in context). Taiclet's admission was made in connection with a massive cost overrun charge. The obvious inference is that when Taiclet admitted "[c]hallenges and performance issues" led to requiring "significant changes to processes and testing approach," he was referencing Lockheed's failure to control the costs and risks of the Aeronautics Program. ¶212.

**Not Protected by Safe Harbor:** Defendants argue that the de-risking statements are also protected by the PSLRA safe harbor. Motion at 15. They are wrong.

First, Defendants' statements in ¶¶177 and 179, such as Malave's statement claiming Lockheed had "***de-risked***" the Aeronautics Program, are not forward looking. These statements referred to actions that Lockheed had **already** ostensibly taken—so Lockheed could claim they **had already** "significantly reduced the risk." ¶179; *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 254 (S.D.N.Y. 2020) (statements discussing past events not forward looking). Second, even if forward looking, which they are not, these statements are not protected by the safe harbor because they were made with contemporaneous knowledge of falsity and were not accompanied by cautionary language of the relevant risk (that Lockheed's cost and risk management processes were deficient). *See supra* at 19-20.

**Not Opinions:** Defendants further claim that Defendants' statements that they "de-risked" the Aeronautics program (¶¶177-79) and were taking a more conservative approach on costs (¶183) are opinion statements. These statements are not opinions: these are "determinate, verifiable statements." *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *3 (S.D.N.Y. 2024). Moreover, like the MFC Program statements, Defendants' claims that they had successfully "de-

21

risk[ed]" and "contain[ed]" losses in Lockheed's Aeronautics Program did "not rest on the inquiry or investigation that a reasonable investor would expect." *LSB*, 2017 WL 7052046, at *1. So even if an opinion, these statements are actionable. *Id*.

**Not Puffery:** Finally, Defendants argue that their statements that they had "de-risked" (¶¶177-79) and "contained" costs (¶183) were puffery, essentially arguing investors did not care whether Lockheed had mitigated the risk of future cost overruns. That argument is absurd and belied by even a cursory exam of both the statements and the surrounding context. Statements cannot be dismissed as puffery "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). These statements concerned Lockheed's ability to mitigate risk for its primary sources of revenue. Obviously, this was important to investors, as demonstrated by analysts' dismayed reaction when they discovered Lockheed had not "de-risked the problem programs." ¶145.

### c.    Defendants Misled Investors About the F-35 Program

Like the MFC and Aeronautics Programs, the F-35 Program was also over cost and caused significant, undisclosed problems at the Company. Specifically, Lockheed had failed to successfully manage ballooning costs, implement the TR-3 software upgrade, and deliver previous lots on time. This stalled negotiations with the U.S. government, delaying Lockheed's ability to recognize revenue from its F-35 contracts.

Despite these challenges, Defendants touted the program and misled investors about its status. For example, on July 23, 2024, Defendant Taiclet claimed that Lockheed "*continue[s] to produce at a rate of 156 aircraft per year, and expect[s] to deliver 75 to 100 aircraft in the second half of 2024.*" ¶163. Defendant Malave added that Lockheed "*expect[s] F-35 Lot 18 and 19 to be awarded this year, maintaining program funding, and continuity.*" *Id*. These statements were

22

false because they omitted the material facts that Lockheed's failure to implement TR-3, deliver previous lots on time, and manage the ballooning costs of the program had stalled negotiations with the government.[4] Without those facts, the market was forced to rely on Defendants' misleading characterization of the F-35 Program. *See In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 831-34 (S.D.N.Y. 2017) (omission of known delays made statements false and misleading).

In response, Defendants again shoot at a target of their own making. They claim that because Lockheed ultimately delivered aircraft at the promised rate and that Lockheed's struggles with TR-3 were publicly reported, the aforementioned statements cannot be false. Motion at 21-22. But that is not what the Complaint alleges was misleading about the F-35 statements. These statements were misleading because they communicated that there were no issues with the F-35 contracts, while omitting that operational and cost issues, as well as Lockheed's inability to integrate TR-3, delayed negotiations with the U.S. government. ¶116.

Defendants also claim these statements were protected by the PSLRA safe harbor. But that argument ignores that these misstatements are premised on omissions, which the safe harbor does not protect. *Salix*, 2016 WL 1629341, at *9. And even if these statements were subject to the safe harbor, the cautionary language was not meaningful: the risk disclosures warned of events that may transpire, without disclosing "the risk has [already] transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). By the time Defendants made the misstatements, their failure to develop the TR-3 upgrade, manage costs, and successfully negotiate with the U.S. government had already occurred. The safe harbor does not protect these misstatements.

---

[4] Defendants claim that Lockheed's failure to implement TR-3 was unrelated to the stalled negotiations of Lots 18 and 19. Motion at 21-22. These attempts to dispute the factual allegations of the Complaint are inappropriate at the motion to dismiss stage and should be disregarded.

**B.      The Complaint Adequately Alleges Scienter**

A plaintiff may plead scienter either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Strong circumstantial evidence of scienter includes situations where Defendants "had access to information suggesting that their public statements were not accurate; or [] failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306. "The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007). Here, a holistic review of the allegations establishes scienter.

**1.      Former Employee (FE) Accounts Support an Inference of Scienter**

The FE accounts, which demonstrate the issues with cost overruns and risk management were systemic and pervasive, strongly support an inference of scienter. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 504 (S.D.N.Y. 2005) (finding scienter for non-disclosure of cost overruns when multiple CWs testified about systemic cost overruns). For example, FE-1 stated that the MFC Program was already over cost well before the Class Period, causing the Company to have internal discussions as early as 2019 about redesigns to help lower costs. ¶¶101, 242. However, those remediation efforts were not implemented in time, and as a result, it was known internally many months before the Class Period that the MFC Program would suffer losses. ¶¶242-43.

Defendants argue that the FE allegations should be ignored because all three FEs worked in MFC and thus cannot speak to the Aeronautics division. This narrow view of the allegations ignores that the FEs allege a systemic course of conduct throughout Lockheed. For example, FE-2 explained that, in general, contracts were taken in order to boost bonuses but ended up being

24

over cost and behind schedule. ¶81. According to FE-2, certain contracts were negotiated improperly and there was no due diligence done to ensure Lockheed could complete a contract. ¶102. Indeed, the FE allegations further establish Defendants knew of these losses and discussed them internally. FE-2, for example, recalled that loss-making contracts were presented to management, who would discuss how they wanted to "manipulate or massage the numbers" and "sweep things under the rug." ¶¶81-82. Similarly, FE-1 explained there were regular meetings concerning the status of the MFC Program. ¶245.

Finally, Defendants try to dismiss the FEs because they did not directly recount interactions with Taiclet or Malave. This is wrong, as "[t]he notion that the CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law." *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. 2019).

### 2.    Defendants' Admissions Support an Inference of Scienter

Defendants' admissions that Lockheed needed to "improve the performance and oversight of th[e] program[s]" are also indicative of scienter. ¶¶212-13. These admissions—combined with the magnitude of the charges over prior months and the FE accounts of cost oversight deficiencies before the Class Period—strongly support an inference of scienter. *See Value Health, Inc.*, 958 F. Supp. at 757 (CEO's admission of "shortcomings" in due diligence process created a "strong inference" of scienter). Defendants argue that adding additional controls does not support an inference of scienter. Motion at 26. However, the thrust of the disclosure was not just that Defendants were adding additional controls to its processes, but that the processes themselves had been deficient. *See* ¶¶211-13.

### 3.    Defendants' Own Statements Demonstrate Knowledge

Throughout the Class Period, Defendants repeatedly told investors they closely monitored the MFC and Aeronautics Programs and discussed the risks that Lockheed faced from those fixed-

price contracts. *See* ¶¶221-24, 227-32. Defendants also repeatedly discussed the F-35 Program. *See* ¶¶225-26. These statements support an inference of scienter, as courts routinely find scienter when a defendant regularly discusses a topic in detail. *In re Estee Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *9 (S.D.N.Y. 2025) (finding scienter for statements on areas Defendants discussed in detail).

For the MFC and Aeronautics Programs, Defendants repeatedly stated that they were closely monitoring the programs and were aware of the fixed-price risks from them. For example, with regard to the MFC Program, Defendant Malave stated that Defendants were keeping a "tight lid on . . . costs." ¶156. Similarly, regarding the Aeronautics Program, Malave told investors that he and other Lockheed executives "monitor that one pretty closely." ¶160. And later when discussing the $410 million loss in the Aeronautics Program taken in the fourth quarter 2024, Malave told investors that "earlier in the year," meaning early in 2024 (the start of the Class Period), "we had realized th[e] risk . . . causing us to perform a more comprehensive review of current performance versus our key assumptions included in the estimate[.]" ¶179. These statements establish scienter.

Defendants argue that pointing to these statements, some of which are alleged as false, to support scienter is a circular argument, as falsity and scienter are different elements. Motion at 27. That is another red herring. From these statements, it is clear that if there were deficiencies with Lockheed's cost analysis and risk management processes (which there were), Defendants were aware of those. Thus, their statements claiming they closely monitored the programs and fixed-price cost risks support an inference of scienter.

Defendants next suggest that the Complaint fails to allege the "particularized facts" that Defendants' monitoring of the programs revealed. *Id*. But that is wrong; the Complaint plainly

alleges that the specificity of Defendants' statements (as well as FE testimony and Taiclet's ultimate admission that Lockheed's procedures needed improvement) supports an inference that Defendants knew that Lockheed's cost and risk management procedures were deficient.[5] *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 319 (S.D.N.Y. 2024) (Defendants' statements they were monitoring supply chain supported inference of scienter for supply-chain statements).[6]

### 4.    Motive and Opportunity

Defendants Taiclet and Malave's incentive compensation packages provide further indicia of scienter. Defendants argue that an incentive compensation package cannot support scienter, but the Second Circuit has recently clarified that incentive-based compensation supports scienter if a complaint alleges a "direct link between the compensation package and the fraudulent statements." *Hain*, 156 F.4th at 145. Here, Defendant Taiclet and Malave's compensation were largely based on equity compensation, which depended on Lockheed maintaining its stock price, cash flow, and capital efficiency. ¶¶248-51. This was corroborated by FE-2, who explained that contracts were thrown together quickly to "help the financial numbers" and were taken to inflate numbers and boost bonuses. ¶252.

Defendants also suggest that Malave and Taiclet's increased stock holdings and the Company's stock buybacks rebuts any inference of scienter. But Malave's and Taiclet's compensation was stock-based; the increased holdings had nothing to do with their belief in the

---

[5] Defendants also incorrectly claim that Lead Plaintiffs must identify specific reports that contradict Defendants' statements. *See In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 522 (E.D.N.Y. 2025) (collecting cases).

[6] This case is unlike *In re Block, Inc. Sec. Litig.*, 2025 WL 2607890, at *16 (S.D.N.Y. 2025), where the plaintiffs simultaneously and contradictorily alleged a company had inadequate data breach detection systems and that these systems should have detected a data breach sooner. Lead Plaintiffs' contention is different: because Defendants spoke about how closely they monitored risks and costs processes, they must have been aware of the alleged deficiencies.

stock price. And the stock buybacks are irrelevant, considering Lockheed repurchased **substantially less stock** in 2024 than in prior years—presumably knowing the stock price would decline once the Company disclosed the losses. *See* Ex. 11 at 44 (Lockheed repurchased $6 billion of stock in 2023 and $3.7 billion in 2024).

### 5.     Malave's Departure

Defendants argue that Malave's suspiciously timed departure cuts against an inference of scienter because Malave left to "pursu[e] other opportunities" at a different company. Motion at 26-27. Defendants' self-serving explanation ignores the context of Malave's departure and its connection to the allegations. Malave resigned on April 17, 2025—nine weeks after assuring investors losses were "well-contained" and that he had a "good beat and handle on that cost over the next number of years." ¶¶46, 135–36, 183. But he did not, and three months later, Lockheed was forced to disclose another $950 million in losses and admitted its processes needed sweeping overhauls—reforms the new CFO implemented. ¶¶137–41. The timing of the resignation, combined with the charges taken in the surrounding time period, strongly supports an inference of scienter. *In re Pareteum Sec. Litig.,* 2021 WL 3540779, at *17 (S.D.N.Y. 2021) (executive departure within weeks of restatement supported "strong inference of scienter.")

### 6.     Core Operations Doctrine

Finally, the core operations doctrine adds to a compelling inference of scienter. All three programs were vital to Lockheed. The F-35 Program was Lockheed's "largest program," accounting for more than a quarter of Lockheed's revenue. ¶234; *Avon*, 2019 WL 6115349, at *20 (finding scienter for statements concerning company's largest market, which was 21% of revenue). And Malave described the MFC and Aeronautics Programs as "growth engine[s]" during the Class Period. ¶237.

28

### 7.    The More Compelling Inference is Fraudulent

Defendants argue they did their best to warn investors of the risks. Motion at 28-29. However, this argument is not more compelling than the Complaint's allegations of scienter. Indeed, Defendants ignore the allegations establishing that the Company's cost and risk management procedures were deficient before the Class Period (which they later admitted), and that despite this, Defendants made affirmative misrepresentations to investors that misled them and directly caused their losses.

### C.    The Complaint Adequately Alleges Control Person Claims

The Complaint also states control-person claims under Section 20(a) against Defendants Malave and Taiclet. While Defendants suggest that a complaint must allege "culpable participation," courts in this circuit have rejected that argument. *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005). Even if required, the strong inference of scienter here provides that element.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in full. If the Court dismisses any or all of the Complaint, Lead Plaintiffs respectfully request leave to amend pursuant to Rule 15 of the Federal Rules of Civil Procedure as this is the first complaint considered.

DATED: April 27, 2026                    Respectfully submitted,

                                         */s/ Michael P. Canty*
                                         **LABATON KELLER SUCHAROW LLP**
                                         Michael P. Canty
                                         James T. Christie
                                         Nicholas D. Manningham
                                         140 Broadway
                                         New York, New York 10005
                                         Telephone: (212) 907-0700
                                         Facsimile: (212) 818-0477
                                         mcanty@labaton.com

jchristie@labaton.com
nmanningham@labaton.com

*Counsel for Lead Plaintiffs*

## **LOCAL RULE 7.1(C) CERTIFICATION**

I, James T. Christie, hereby certify that this memorandum of law complies with the word-count limitations set forth in Rule 7.1(c) of the Local Rules of the United States District Court for the Southern District of New York and contains 8,747 words, exclusive of the caption, table of contents, table of authorities, signature blocks, and this certificate.


DATED:          April 27, 2026
                New York, New York


                                        /s/ *James T. Christie*
                                        James T. Christie